UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CASE NO. |
| EX REL. [UNDER SEAL] | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | COMPLAINT FOR VIOLATIONS |
| v. | ) | OF THE FEDERAL FALSE |
| | ) | CLAIMS ACT |
| [UNDER SEAL], | ) | |
| | ) | JURY TRIAL DEMANDED |
| DEFENDANTS. | ) | |
| | ) | **FILED IN CAMERA & UNDER** |
| | ) | **SEAL** |
| | ) | **(AS REQUIRED BY 31 U.S.C. §** |
| | ) | **3730(b)(2))** |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

**FILED IN CAMERA AND UNDER SEAL**

**DO NOT ENTER IN PACER**

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>*ex rel*. [UNDER SEAL<br>RELATOR A], | ) ) ) | CASE NO. |
| | ) | |
| PLAINTIFF, | ) ) | COMPLAINT FOR VIOLATIONS<br>OF THE FEDERAL FALSE |
| v. | ) ) | CLAIMS ACT |
| | ) | |
| [UNDER SEAL DEFENDANT 1];<br>[UNDER SEAL DEFENDANT 2];<br>[UNDER SEAL DEFENDANT 3];<br>[UNDER SEAL DEFENDANT 4]; and<br>[UNDER SEAL DEFENDANT 5], | ) ) ) ) ) | JURY TRIAL DEMANDED<br><br>**FILED IN CAMERA & UNDER<br>SEAL**<br>**(AS REQUIRED BY 31 U.S.C. §<br>3730(b)(2))** |
| | ) | |
| DEFENDANTS. | ) ) ) ) ) ) | |

**FILED IN CAMERA AND UNDER SEAL**

**DO NOT ENTER IN PACER**

## COMPLAINT

For their complaint, the United States of America ex rel. Under Seal Relator A (the "United States") alleges as follows:

I.   **INTRODUCTION**

1.      This is an action to recover damages and civil penalties on behalf of the United States, the real party in interest, under the Federal False Claims Act, 31 U.S.C. §§ 3729–33 (the "FCA") against Under Seal Defendant 1, Under Seal Defendant 2, Under Seal Defendant 3, Under Seal Defendant 4, and Under Seal Defendant 5 ("Defendants").

2.      Defendants are engaged in a scheme to knowingly submit, cause to be submitted, and conspire to submit false claims for payment to the United States by submitting false "risk adjustment" information to the Centers for Medicare & Medicaid Services ("CMS") in order to improperly increase the amounts CMS pays them or their clients.  Likewise, Defendants have knowingly retained overpayments received from CMS as a result of their false risk adjustment submissions.

3.      The Medicare Advantage ("MA") program is designed to apply to Medicare a form of the "managed care" model commonly used by private health insurance companies.  Under the managed care model, an employer or other organization seeking health care for its members—here the United States through the Medicare Program—pays a managed care organization a fixed fee to provide health services to its members.  The payment is typically a per-member-per-month ("PMPM") rate, also known as a capitation rate.  The managed care organization receiving capitation payments (often a hospital, physician group, or other health insurance company) is

responsible for paying hospitals, physicians and all other medical providers for health care services provided to the members of the plan.  This differs from traditional fee-for-service ("FFS") models, where the organization pays individual physicians, hospitals and other providers for each service they provide to the organization's members.

4.      Through the MA program, Medicare allows private health insurers to set up managed care plans to cover Medicare beneficiaries.  Medicare pays a monthly capitation rate for each beneficiary enrolled as a member of a MA plan.  MA plans must then use that money to pay hospitals, physicians and other health care providers for the services the plan members receive and cover the plans' administrative expenses.  Certain MA plans are also given money to pay for the plan members' prescription drugs.  Under both types of plans, CMS adjusts the capitation rate for each beneficiary to reflect that beneficiary's individual demographics (e.g., age and gender), geographic location, and health status.

5.      The adjustment for each member's health status is one of the most significant components of the capitation rate.  Individuals with multiple and/or serious health conditions account for more healthcare costs than healthy members.  Accordingly, CMS pays a substantially higher capitation rate for members who have been recently treated for one or more serious, expensive diseases or conditions.  These increased payments are known as "risk adjustment" payments.  On average, CMS pays a MA plan close to $3,000 per year for each condition that a member has that requires a risk adjustment payment.

6. To receive these risk adjustment payments, MA plans submit encounter data to CMS each year for each member for each qualifying disease or condition. When the plan submits these claims, it must assert that the member received treatment in the twelve-month period before the payment year for the diagnosed condition from a qualified healthcare provider. MA organizations may only submit a diagnosis for risk adjustment that: (1) stems from a face-to-face visit; (2) with a qualified healthcare provider; (3) during the appropriate service period; and (4) is documented in a medical record.

7. Under Seal Defendant 1 and Under Seal Defendant 2 are engaged in systematic fraud in which they routinely:

    (a)    "Upcode" risk adjustment claims by submitting claims for diagnoses that the member does not have or for which the member was not treated in the relevant year, or by claiming that a member was treated for a more serious condition than the member actually has; and

    (b)    refuse to correct (and refuse to reimburse Medicare for) previously submitted risk adjustment claims when defendants discover, or in the exercise of reasonable care should discover, that those previously submitted claims were false.

8. Under Seal Defendant 3 is engaged in systematic fraud by assisting and causing MA organizations, including Under Seal Defendant 1 and Under Seal Defendant 2, to submit fraudulent risk adjustment claims, and failing to correct (and reimburse

Medicare) for previously submitted false claims.  Under Seal Defendant 4 and Under Seal Defendant 5 are top executives at Under Seal Defendant 3 and, in Relator's understanding, are the driving force behind Under Seal Defendant 3's fraudulent scheme.

9.      Through this scheme, defendants have defrauded the United States of millions of dollars.

10.     Defendants' conduct alleged herein violates the federal False Claims Act. The federal False Claims Act (the "FCA") was originally enacted during the Civil War. Congress substantially amended the Act in 1986—and, again, in 2009 and 2010—to enhance the ability of the United States Government to recover losses sustained as a result of fraud against it.  The Act was amended after Congress found that fraud in federal programs was pervasive and that the Act, which Congress characterized as the primary tool for combating government fraud, was in need of modernization.  Congress intended that the amendments would create incentives for individuals with knowledge of fraud against the Government to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

11.     The FCA prohibits, inter alia: (a) knowingly presenting (or causing to be presented) to the federal government a false or fraudulent claim for payment or approval; (b) knowingly making or using, or causing to be made or used, a false or fraudulent record or statement material to a false or fraudulent claim; (c) knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly

and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government; and (d) conspiring to violate any of these three sections of the FCA. 31 U.S.C. §§3729(a)(1)(A)-(C), and (G). Any person who violates the FCA is liable for a civil penalty of up to $11,000 for each violation, plus three times the amount of the damages sustained by the United States. 31 U.S.C. §3729(a)(1).

12. For purposes of the FCA, a person "knows" a claim is false if that person: "(i) has actual knowledge of [the falsity of] the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. §3729(b)(1). The FCA does not require proof that the defendants specifically intended to commit fraud. Id. Unless otherwise indicated, whenever the words "know," "learn," discover" or similar words indicating knowledge are used in this Complaint, they mean knowledge as defined in the FCA.

13. Each claim for risk adjustment payments that defendants have submitted or caused to be submitted to CMS, where the patient was not treated, by a qualified provider, for that condition in the year in question, and/or the treatment and condition are not properly documented in the medical record is a false and/or fraudulent claim within the meaning of the FCA, so long as defendant knew that the claim was false when it was submitted, or the defendant later discovered its falsity and refused to correct the claim.

14. The FCA allows any person having information about an FCA violation to bring an action on behalf of the United States, and to share in any recovery. The FCA requires that the Complaint be filed under seal for a minimum of 60 days (without service

on the defendant during that time) to allow the government time to conduct its own investigation and to determine whether to join the suit.

15.     Based on the foregoing laws, qui tam plaintiff / Relator Teresa Ross seeks, through this action, to recover damages and civil penalties arising from the false or fraudulent records, statements and/or claims that the Defendants made or caused to be made in connection with false and/or fraudulent claims for Medicare Advantage and Medicare Part D risk adjustment payments.

## II.     PARTIES

16.     Under Seal Relator A is Teresa Ross ("Relator"), a resident of Federal Way, Washington and an employee of Under Seal Defendant 1.

17.      Under Seal Defendant 1 is Group Health Cooperative ("GHC"), a Washington non-profit corporation with its principal place of business in Seattle, Washington.  It was founded in 1947 and operates as a non-profit consumer-governed health care organization that provides managed care plans to members in twenty-two counties throughout Washington and Idaho.  GHC operates Medicare Advantage plans in twenty counties in Washington.  In 2010, GHC had Medicare and Medicaid revenues of over $700 million.

18.     Relator Teresa Ross has worked at GHC for fourteen years and is currently the Director of Insurance and Health Data Analysis ("IHDA").  In that position, she has implemented the standard risk adjustment claims verification procedures used by GHC and developed successful algorithms to identify and correct diagnosis coding issues and ensure accurate and complete risk adjustment claims submissions.  Relator has

extensive knowledge of the Medicare risk adjustment system developed both during her time running the GHC risk adjustment department and during her participation in and around 2002in the administrative process whereby CMS developed and implemented the risk adjustment system.

19.     Under Seal Defendant 2 is Independent Health Corporation ("IHC"),  a New York corporation with a principal place of business in Buffalo, New York.  IHC operates as the for-profit subsidiary of Independent Health Association.  Through its contracts with CMS, IHC offers Medicare Advantage plans to members across New York.

20.     The United States, the real party in interest, has ongoing contracts with Defendants GHC and IHC through the Centers for Medicare and Medicaid Services ("CMS") of the Department of Health and Human Services, in accordance with GHC and IHC's participation in the Medicare programs.

21.     Under Seal Defendant 3 is DxID LLC, a New York limited liability company with a principal place of business in East Rochester, New York.  DxID was founded in September 2011 as a wholly owned subsidiary of Independent Health Corporation.  DxID provides risk-adjustment review services to health care companies operating managed care plans under the Medicare Advantage program, including GHC and IHC.  It was founded to oversee and facilitate the submission of risk adjustment data from IHC's MA plans to CMS, including having its auditors perform retrospective chart reviews to identify additional chronic conditions to support new risk adjustment claims.  Later, the company expanded to provide its risk-adjustment services to other health care

companies that offer Medicare Advantage Plans. On information and belief, DxID provides its risk-adjustment services to many of its MA plan clients on a contingency fee basis, i.e., in lieu of an hourly fee, DxID receives a percentage of the payment for whatever additional risk adjustment claims that DxID identifies for the MA Plan. CMS discourages the use of contingency fee arrangements (and considers them inherently suspect) because they create perverse incentives for vendors like DxID to find new risk adjustment claims, and no incentive to correct erroneous risk adjustment claims found during chart review.

22.     Under Seal Defendant 4 is Dr. John Haughton, DxID's Consulting Risk Adjustment Advisor.  Dr. Haughton is responsible for the development of DxID's risk adjustment claims review and submission methodology.  He has extensive experience in risk adjustment and knowledge of Medicare's coding rules and regulations. Notwithstanding that knowledge, he developed the DxID risk adjustment system that systematically violates those well-established rules and causes the submission of thousands of false risk adjustment claims. Mr. Haughton is believed to be 49 years old, currently residing in Severna Park, Maryland.

23.     Under Seal Defendant 5 is Betsy Gaffney, Co-Chief Executive Officer of DxID.   She ran IHC's risk adjustment retrospective review department – which department eventually became DxID.  In her roles at both IHC and DxID, she has been directly and personally involved in developing and implementing DxID's risk adjustment claims review and submission practices.  In pitching DxID's fraudulent risk adjustment coding approach to GHC, Ms. Gaffney rationalized the scheme, stating: "Risk adjustment

is a game, and you need to learn how to play it." Ms. Gaffney is believed to be 56 years old and currently residing in Rochester, New York.

24.     Defendants Haughton and Gaffney are named individually as defendants because of the direct, personal and substantial role they have played in the fraudulent conduct and scheme at issue in this complaint.  Hereafter in this complaint, though, they are referenced collectively as DxID.

III.   **JURISDICTION AND VENUE**

25.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), which specifically confers jurisdiction on this Court for actions brought under 31 U.S.C. § 3730.

26.     This Court has personal jurisdiction over the Defendants, pursuant to 31 U.S.C. §3732(a), as one or more Defendants can be found in, reside in, transact business in, and have committed acts related to the allegations in this Complaint in the Western District of New York.  Defendants DxID and Independent Health Corporation are New York companies headquartered in the Western District of New York.

27.     Venue is proper, pursuant to 31 U.S.C. § 3732(a), as the Defendants can be found in, reside in, and/or transact business in the Western District of New York, and because many of the violations of 31 U.S.C. § 3729 discussed herein occurred within this judicial district.

IV.   **LEGAL PRINCIPLES**

28.     Medicare is a federally-funded health care program primarily serving people age 65 or older.  Initially created in Title XVIII of the Social Security Act of

1965, Medicare now has four Parts, A through D.  The two original components of Medicare are Part A, which covers inpatient hospital costs and related services, and Part B, which covers outpatient health care costs, such as physicians' fees.

29.     Traditionally, Medicare operates on a fee-for-service basis, meaning that Medicare directly pays hospitals, physicians and other health care providers for each service they provide to a Medicare beneficiary.  Medicare beneficiaries are generally required to pay some portion of many of these services in the form of copayments, deductibles, coinsurance, or other set fees (collectively known as the members' "out of pocket" expenses).

30.     In 1997, Congress created Medicare Part C, which provides similar benefits to Medicare members, but does so based on a managed care model, rather than the traditional fee-for-service model.  Under Part C, rather than pay providers directly, Medicare pays private managed care plans (later named "Medicare Advantage" or "MA" plans) a capitation rate (per member per month) and those plans are responsible for paying providers for the services they provide to members of that specific MA plan.

31.     MA plans must provide Medicare beneficiaries benefits at least equivalent to those they would have received under the traditional Medicare Parts A and B. Depending on the structure of the plan, MA plans may also provide additional benefits beyond what traditional Medicare would have covered, such as dental care, or cover some or all of their members' out of pocket expenses associated with basic Medicare Parts A and B services.

32.     In 2003, Congress passed the Medicare Prescription Drug, Improvement, and Modernization Act, creating Medicare Part D which provides prescription drug coverage.  Although a limited number of Medicare Part D plans are operated under a cost-reimbursement contract, the plans are generally financed under a managed care model.  These managed care model plans are provided under both Part D prescription drug plans, which offer only prescription drug coverage, and Part C plans, which integrate the prescription drug coverage with the traditional Part C health care coverage.

33.     This Complaint refers, collectively, to Medicare Advantage plans with and without Part D coverage, and stand-alone managed care Medicare Part D Plans as "Medicare Advantage Plans" or "MA Plans."

### A.     Calculation of MA Plan Capitation Rates

34.     The capitation rates Medicare pays to MA plans are determined based on a process involving consideration of past and expected future medical expenses, the location of the plan's actual and expected members, the health status and demographics of those members and whether the plan will include any additional benefits.  That process is summarized in Medicare regulations as follows:

> In short, under the bidding methodology each plan's bid for coverage of Part A and Part B benefits (i.e., its revenue requirements for offering original Medicare benefits) is compared to the plan benchmark (i.e., the upper limit of CMS' payment, developed from the county capitation rates in the local plan's service area or from the MA regional benchmarks for regional plans).  The purpose of the bid-benchmark comparison is to determine whether the plan must offer

supplemental benefits or must charge a basic beneficiary premium for A/B benefits.

Medicare Managed Care Manual ("MMCM"), ch. 8, § 60.

35.     In other words, it is a three-step process involving: (a) development of the MA plan's bid rate; (b) review of the CMS benchmark rate; and (c) comparison of those two rates to develop the base capitation rate and determine whether any adjustments in the plan benefits or member premiums are required.

36.     First, the MA plan develops a bid rate. This rate is the amount that the MA plan expects it will be required to pay to provide Medicare Parts A and B benefits to a hypothetical average member of the plan. This estimate must be based on either the MA plan's prior experience covering Medicare members, or an actuarially validated data analysis of expected costs. To represent an "average" plan member, the bid rate must make adjustments to standardize the effect of expected geographic diversity (because some areas are more expensive than others) and the relative health status (i.e., the number and nature of chronic conditions) of the members whose claims experience provided the basis for the bid. The bid rate also includes an amount that the MA plan expects to spend on administrative costs, and a profit margin.

37.     The mechanism for standardizing the bid for individuals' demographic factors and health status is known as the "risk score." It is an artificial score that CMS assigns to every beneficiary. CMS starts with a score of zero, and then adds points for the beneficiary's demographic condition (such as age and gender) and individual disease states (such as diabetes or congestive heart failure). The average risk score is one, with

most Medicare beneficiaries having scores under three.  The risk score model is designed so that a population with an average risk score of two would be expected to use twice as much health care (in dollars) as a population with a score of one.  The bid rate the MA plans develop must reflect the amount they will require to provide services to a hypothetical population with a risk score of one.

38.     Second, the MA plan must review the Medicare benchmark rate provided by CMS.  This rate is the amount that the Medicare program would spend to provide Parts A and B benefits to an average member in the geographic area covered by the MA plan's bid.  The benchmark rate also includes several other adjustments, including until recently a bonus payment to incentivize health insurance companies to enter the MA market.

39.     Third, the bid rate and the benchmark rate are compared to determine whether the MA plan must charge its members a premium, or, instead, if it must offer them enhanced benefits.  If the bid rate is greater than the benchmark rate, Medicare will only pay the MA plan the benchmark rate per member per month.  That benchmark rate becomes the base capitation rate that CMS pays the MA plan for a member with a 1.0 risk score (described below).  The MA plan must then charge the beneficiaries who join its plan a monthly premium in order to make up the shortfall between the bid rate and the base capitation rate.  See MMCM, ch. 8, § 60.1.

40.     If, on the other hand, the bid rate is less than the benchmark rate, then the bid rate becomes the base capitation rate.  The difference between the benchmark rate and the bid rate is then split between the MA plan and the Medicare program.  The first

25% of the difference is retained by the Medicare program as plan savings. The remaining 75% is returned to the MA plan, which must use the rebate to either provide enhanced benefits to its plan members or to cover the members' out of pocket expenses. In the end, then, in such situations, the base capitation rate equals the bid rate, plus the MA plan receives 75% of the difference between the bid rate and the benchmark rate.

41.     Medicare does not, however, pay the plans the base capitation rate. Instead, when payments are actually made, the base capitation rate is adjusted, for each member, to reflect his or her actual age, gender, location, and, most important, health status.

42.     MA plans must rebid their rates every year.

**B.     Calculation of Part D Plan Capitation Rates**

43.     The process of calculating the capitation rates for the Part D portion of MA plans is very similar to the process used for the base portion of the MA rate. Annually, the plan develops and submits a bid rate based on the plan's estimate of the monthly revenue requirements it will require to provide qualified prescription drug coverage for an average, eligible individual. 42 C.F.R. § 423.265(c). As for the base MA rate, a Medicare prescription drug coverage plan's average monthly bid rate is adjusted to take into account the geographic differences in pricing and the relative health status of the members on whom the bid calculation was based.

44.     The risk score calculations for the Medicare Part D portion of the plans mirror the calculation for the basic MA rate, determined by each beneficiary's demographic information and health status. Each plan's bid must reflect the revenue the

plan will require to provide services to a population of "average" members, i.e., those with a risk score equal to one.

### C. Risk Adjustment Depends on Accurate, Substantiated Health Condition Codes

45.     As described above, CMS pays MA plans at a capitation rate that reflects, among other things, each member's health status.  The process of adjusting the capitation rate to reflect a member's disease states is known as risk adjustment.  Risk adjustment is intended to improve the accuracy of the payments CMS makes to these plans.  To this end, CMS pays a higher future premium for enrollees whom the MA plan represents have been treated for certain diseases and conditions in the current year, based on the expectation that those enrollees will require treatment and/or management for the conditions in the following year. See 2008 Risk Adjustment Training for Medicare Advantage Organizations Participant Guide ("Participant Guide"), at 6.4.1 (for purposes of this Complaint, "treatment" is defined as treatment and management within the meaning of the Participant Guide).

46.     Conversely, CMS pays a lower premium for enrollees who, although they may have certain typically expensive conditions, did not require care, treatment or management for those conditions in the current year.  For these members, the risk adjustment methodology assumes that because their condition did not require treatment in the current year, it has improved or otherwise changed so that it is not expected to require treatment in the following year.

47.     As a practical matter, the CMS risk adjustment model evaluates enrollee health (and establishes risk adjustment payment rates) using diagnosis classifications set

forth in the International Classification of Diseases, 9th Edition, Clinical Modification ("ICD-9-CM") system.  The ICD-9 system assigns each diagnosis a specific code, which is "used to describe the clinical reason for a patient's treatment." <u>ParticipantGuide</u>at 6.2. Under the MA model, these individual diagnosis codes are then organized into groups, called Hierarchical Condition Categories ("HCCs").  MMCM, ch. 8, § 50.  Every HCC consists of several ICD-9-CM diagnosis codes that are clinically related and are expected to require a similar level of resources to treat.  <u>Id</u>.  For example, there are five HCCs for members with diabetes: HCC 15 (diabetes with renal or vascular manifestation); HCC 16 (Diabetes with Neurologic or Other Specified Manifestation); HCC 17 (Diabetes with Acute Complications); HCC 18 (Diabetes with Ophthalmologic or Unspecified Manifestation); and HCC 19 (Diabetes without Complication). Generally speaking, members grouped in HCC 15 have the most serious manifestations associated to their diabetes, and are expected to cost the most to treat.  Members in HCC 19 have the least cost-intensive type of diabetes, and therefore the CMS risk adjustment system provides a smaller enhanced payment for these members.

48.     CMS has used the same model for the Part D portion of risk adjustment. However, because certain diagnoses will be expected to increase liability for prescription drugs covered under Part D, but not hospital costs and physician fees covered under Part C, and vice versa, a distinct list of Hierarchical Condition Categories ("RxHCCs") with corresponding diagnosis codes was created for Medicare's Part D risk adjustment. <u>See</u><u>Participant Guide</u> at 8.2.5.2.  For example, RxHCC 75 represents Attention Deficit Disorder, a condition predicted to increase drug spending.  However, because Attention

Deficit Disorder is unlikely to result in hospitalization, RxHCC 75 has no corresponding HCC.  On the other hand, HCC 77, Respirator Dependence/ Trachostomy Status, a condition category predictive of Medicare Part C medical costs, but not necessarily predictive of Part D drug expenses, has no RxHCC equivalent.

49.     Although the HCC and RxHCC systems are not identical, they do have significant overlap.  Certain HCCs have equivalent RxHCCs, meaning that the condition categories consist of identical ICD-9-CM diagnosis codes.  For example, HCC 5 (Opportunistic Infections) is equivalent to RxHCC 2 (Opportunistic Infections), and HCC 37 (Bone/Joint/Muscle Infections/Necrosis) is the equivalent of RxHCC 39 (Bone/Joint/Muscle Infections/Necrosis).  Even where they are not identical, most HCCs overlap with one or more RxHCCs.  For example, of the thirty-seven diagnosis codes that fall within HCC 45 (Disorders of Immunity), twenty-seven fall within RxHCC 52 (Disorders of Immunity), seven fall within RxHCC 51 (Severe Hematological Disorders), and three do not fall within any RxHCCs.  Thus, the majority of ICD-9-CM diagnosis codes that capture an HCC will also capture an RxHCC.

50.     An individual ICD-9-CM code included in the HCC system for a particular member corresponds on average to nearly $3,000 in extra revenue for the plan over the course of the following year for that member.

51.     Because submitting incorrect diagnosis codes increases risk adjustment payments, CMS requires MA plans to follow strict guidelines when submitting codes. Only services provided by an eligible provider type may be included.  CMS expressly prohibits MA plans from submitting "risk adjustment diagnoses based on any diagnostic

radiology services" or laboratory services.  Participant Guide, at 3.2.2, 4-3.  The reason CMS prohibits MA plans from submitting codes based on radiology charts, for example, is that "[d]iagnostic radiologists typically do not document confirmed diagnoses. Confirmed diagnoses come from referring physician or physician extenders."  Id. at 4-3 (emphasis added).  Because radiologists generally list on their charts the diagnoses a doctor wants them to look for, not which diagnoses the member actually has, CMS excludes radiology services as a valid provider type (i.e., source of risk adjustment data).

52.    The treating provider must document the facts supporting the coded diagnosis in the member's medical record and sign and date the record.  At a minimum, the plan must record five elements for submission to CMS:

(a)    the member's Health Insurance Claim ("HIC") number;

(b)    the ICD-9-CM diagnosis code;

(c)    the "service from" date;

(d)    the "service through" date; and

(e)    the provider type (e.g., hospital inpatient, hospital outpatient, physician).

53.    MA plans are responsible for the content of risk adjustment data submissions to CMS, regardless of whether they submit the data themselves or through an intermediary.  Participant Guide, at 3-13.  Before submitting data to CMS, MA plans are required to filter the data "to ensure that they submit data from only appropriate data sources."  Participant Guide, at 4-11.  For example, filters should include checking that

physician data comes from face-to-face encounters with members and ensuring that data does not come from non-covered providers, such as diagnostic radiology services.

54.     MA plans that filter risk adjustment claims by CPT codes must also filter the data to ensure that only diagnoses treated through approved procedure types are included.  Id. at 4-11.  MA organizations typically classify professional (e.g., physician) procedures using Current Procedural Terminology ("CPT") codes and institutional procedures using revenue codes.  These codes show whether the type of service in question was a face-to-face procedure such as a physical examination, or a non-qualifying remote procedure, such as a laboratory test or radiology exam.

55.     MA plans are required to correct the risk adjustment data they submit to CMS.  When the MA plan learns that information in a risk adjustment claim (i.e., HIC number, diagnosis code, service dates, and provider type) contains an error, it must submit a "delete record" to CMS for that claim.

56.     CMS also requires that diagnosis codes used as the basis for a risk adjustment claim be substantiated through documentation in a medical record.  Upon request by CMS, MA plans must provide documentation to support each diagnosis and substantiate that the provider followed proper coding guidelines.  Id. at 6-5; 5-52.

57.     In general, CMS sets risk scores based on risk adjustment data submitted for services provided during the year preceding the payment year.  42 C.F.R. §§ 422.310(g), 423.329(b)(3).  The annual deadline for submitting risk adjustment data to CMS is in early September.  Id.  The data submitted by the September deadline determines members' preliminary risk scores for the following year.

58.     Despite the September deadline, CMS accepts submissions of risk adjustment data for a period after the end of service year and, through a reconciliation process, adjusts its payments to the MA plan retroactively to account for codes submitted after the September deadline.  MA plans are allowed to submit risk adjustment data until after the end of the payment year.  After the payment year ends, CMS recalculates the risk score for any members for whom the MA plan made a retroactive submission.

59.     Thus, for example, the capitation rates for 2010 are based on the MA plans' members' health status (diagnosis codes) from 2009.  The initial submission deadline for the 2009 diagnosis codes was September 4, 2009 and the final submission deadline was January 31, 2011.  Thus, CMS calculated members' initial risk factors for 2010 based on the September 4, 2009 data, but MA plans were allowed to continue to submit 2009 diagnoses until January 31, 2011.  After that date, for every member with a newly-submitted diagnosis, CMS recalculated the risk score and reconciled the member's payments in 2010 with the amount it would have paid at the new score.

60.     To test the validity of MA plan risk adjustment data, CMS conducts Risk Adjustment Data Validation ("RADV") audits after the MA plan's final deadline for submitting risk adjustment data for the payment year.  During such audits, CMS "validates" some of the MA plan's HCC scores by reviewing the medical records that the plan contends support the claimed diagnosis codes.  Id. at 7-1.  To facilitate the RADV audits, MA plans are required to submit to CMS medical records and coversheets for each sampled enrollee. Until February 2012, MA plans were required to include the "one best medical record" supporting each HCC.  Id. at 7-9.Beginning with the forthcoming

RADV audit, CMS will allow audited MA contracts to submit multiple medical records for each CMS-HCC being validated. CMS, <u>Notice of Final Payment Error Calculation Methodology for Part C Medicare Advantage Risk Adjustment Data Validation Contract-Level Audits</u>, February 24, 2012.

61.     Historically, CMS has not extrapolated RADV audit results to the plan as a whole.  (CMS has recently proposed moving toward extrapolation of RADV results.) Instead, CMS has merely sought repayment for those risk adjustment claims found to be false during the RADV audit.  Because RADV audits generally used relatively small samples—a few hundred risk adjustment claims—the potential risk to MA plans, should they be found to have submitted false risk adjustment claims, has been relatively small. Without meaningful financial penalties, MA organizations have generally seen little incentive to conform to CMS's risk adjustment rules.  The fraudulent practices described in this Complaint are a product of the belief, common among MA organizations, that the law could be violated without meaningful consequence.

62.     Beginning in January 2012, CMS has required MA organizations to submit their encounter data to CMS directly, rather than to extract and filter risk adjustment data from the encounter data themselves.

**D.     CMS Requires MA Plans To Certify the Validity of Their Bid Rates and Risk Adjustment Data To Prevent Fraud**

63.     In recognition of the fact that the integrity of the capitation rates depends on the integrity of the actuarial information used by the MA plans in developing their bid rates, and to otherwise guard against fraud, CMS requires MA organizations to submit attestations, each signed by the CEO or CFO (or their authorized, direct subordinate).

These attestations are a condition that the MA plans must meet to be eligible to receive any capitation payments from CMS.

64.     The first attestation, which is submitted annually, requires the MA organization to attest that the risk adjustment data it submits annually to CMS is "accurate, complete, and truthful."  The attestation acknowledges that risk adjustment information "directly affects the calculation of CMS payments . . . and that misrepresentations to CMS about the accuracy of such information may result in Federal civil action and/or criminal prosecution."  The regulations also provide that if the claims data are generated by a "related entity, contractor, or subcontractor of an MA organization," that entity must similarly certify the "accuracy, completeness, and truthfulness of the data."  42 C.F.R. §422.504(l)(2).

65.     In addition, the MA organization (and any third-party submitters) must sign an Electronic Data Interchange ("EDI") Enrollment Form prior to submitting risk adjustment data to CMS.  The EDI Enrollment Form is a contract between the MA organization and CMS attesting to the accuracy of the data submitted.  Participant Guide at 4.1.  The MA organization attests on the Form "[b]ased on best knowledge, information, and belief, that it will submit risk adjustment data that are accurate, complete, and truthful."

66.     The next attestation is the MA organization's certification "that the information and documentation comprising the bid submission proposal is accurate, complete, and truthful and fully conforms to the Bid Form and Plan Benefit Package requirements; and that the benefits described in the CMS-approved proposal bid

submission agree with the benefit package the MA Organization will offer during the period covered by the proposal bid submission."

67.     MA organizations must also submit bid submission attestations, certifying "that the information in its bid submission and assumptions related to projected reinsurance and low income cost sharing subsidies is accurate, complete, and truthful and fully conforms to the [bid submission regulations]."

### E.     The False Claims Act Contains a Duty to Correct Known Errors

68.     The False Claims Act contains an independent requirement to correct errors that will cause, or have caused, a government overpayment.  The Act attaches liability to anyone who knowingly makes, uses, or causes to be made or used, a false statement or record material to an obligation to pay or transmit money to the government, or who knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money to the government.  31 U.S.C. § 3729(a)(1)(G).

69.     Accordingly, MA plans not only have a duty not to submit incorrect data to CMS, but also, for data they have already submitted, must delete the records from CMS's database using a "delete code."

### V.     BACKGROUND

70.     As a non-profit, consumer-run organization, GHC has traditionally catered to the public interest, often highlighting its efforts to support low-income patients and provide affordable, quality care.  GHC has received consistently high marks for the quality of the care offered through its own facilities and its network of health care

providers. Its Medicare Advantage plans have also traditionally been well regarded, receiving accolades from industry groups and Medicare itself.

     **A.**    **GHC's  Internal Risk Adjustment Review Department and Proactive Management of Risk Adjustment Claims Submission**

     71.    As described above, because risk adjustment has a significant impact on the capitation rate, any Medicare Part C Plan must carefully monitor its risk adjustment claims to ensure both that all valid claims are submitted and that any claims submitted are valid.  At GHC, the Insurance and Health Data Analysis ("IHDA") department is primarily responsible for reviewing and verifying all risk adjustment codes submitted to CMS.  Relator is the head of the department, and has carefully developed a risk adjustment methodology consistent with the applicable coding standards and CMS regulations.

     72.    As part of the internal procedures developed by IHDA, reviewers look for both diagnoses that were present in the medical records but were not coded by providers when they submitted their claims for reimbursement, and diagnoses that were included on the provider-submitted claims but are not supported by the documentation in the member's medical record.  IHDA fixes both types of errors.

     73.    GHC has several mechanisms to ensure proper coding and documentation. Primarily, GHC utilizes a software algorithm that mines its claims data to match previously submitted risk adjustment claims with existing documentation and flag potential problems.  Once the algorithm identifies a member for review, GHC's team of three full-time Resident Nurses and a network of physicians reviews the documentation and coding supporting GHC's risk adjustment claims for that member.  Chart reviews are

generally done within seven days of a provider visit if data indicates the need to follow-up with the physician.

74.    For example, the algorithms and chart reviews look for situations where a member's past medical records suggested that he or she may have a condition, such as diabetes, but had not yet been treated for that condition in the current year.  Similarly, if the reviewer noticed that the doctor prescribed a treatment for a chronic condition, but did not describe the treatment in the record (for example, prescribing insulin but not indicating treatment for diabetes), the provider would be contacted within seven days to amend the record, if appropriate.  This ensures that a typographical oversight does not prevent the inclusion of diagnosis codes for members who were receiving active treatment.  The prompt contact also ensures that the provider's memory of the visit is freshest at the time of any amendment to the patient's chart.

75.    So too, the algorithms and chart reviewers look for situations where a provider had submitted a claim suggesting a member is currently being treated for a condition, but the member's overall medical record does not support that conclusion.  For example, if a provider claims a member has an active cancer diagnosis, but the member received neither chemotherapy nor a surgical intervention recently, the algorithm flags that risk adjustment claim for review as it is likely that the provider mistakenly diagnosed the member as having active cancer where they actually had a history of cancer.  Upon finding such an error, the diagnosis code would be reviewed and then corrected (through the submission of a "delete" code to CMS), resulting in a smaller monthly capitation payment from CMS to GHC.

76.     Relator and her team carefully developed this process of retrospective review of the risk adjustment data for GHC.  While strictly following CMS and industry coding standards, the IHDA team increased revenues significantly in 2008.

**B.     GHC Executives Try To Boost Risk Adjustment Revenues by Hiring Outside Vendor to Bypass IHDA Department**

77.     Despite the success of the IHDA department, GHC executives have twice hired outside consultants who promised to substantially increase GHC's risk adjustment scores.  In both cases, the outside vendors planned to do this largely by disregarding CMS coding and risk adjustment claims submission rules.  Relator and others on GHC's Documentation and Coding Team ("DC Team") (which team included Relator and other key GHC personnel for billing, coding and related issues) were able to stop the first such effort (by vendor, Leprechaun LLC), but, unfortunately have thus far been unable to stop the second (DxID's fraudulent efforts).

78.     As early as 2007, employees in the IHDA department began hearing complaints from GHC leadership that the department was not bringing in enough money.  Relator was criticized by her superiors for being too "conservative" in her approach to risk adjustment.

79.     At or around October 2008, GHC hired Leprechaun LLC to help GHC "improve" its risk adjustment scores.  Leprechaun provides risk adjustment data review services to MA plans and was known for producing increased revenues through the chart review process.

80.     Leprechaun worked with the Relator's department in its retrospective chart review and coding process.   Leprechaun tried to introduce coding and

documentation standards that conflicted with CMS regulations. Specifically, they proposed submitting risk adjustment claims based on documentation that was clearly inadequate to support such a claim under CMS rules. Relator and others on the DC Team complained to GHC executives and otherwise resisted these efforts by Leprechaun. They demanded the company change its review policies to conform to traditional coding methodologies and avoid compliance risks. Leprechaun and GHC leadership eventually complied.

81.     Relator and her compatriots prevented Leprechaun from submitting the false risk adjustment claims to CMS that it had proposed submitting. Leprechaun, however, did identify a number of legitimate risk adjustment claims that GHC had previously missed. These claims were submitted to CMS.

82.     GHC's financial condition has continued to deteriorate. From 2008 through 2010, GHC went from an operating income of almost $57 million to an operating loss of $60 million. Concerned over the trajectory of the company, GHC leadership made promises to the board of directors regarding the financial performance of the non-profit institution. Because of the substantial financial impact of risk adjustment, GHC CEO Scott Armstrong and CFO Ric Magnuson turned their attention to this area as a potential source of additional revenue – even if it meant breaking CMS rules to do so.

83.     In late 2011, Armstrong attended a conference held by the Alliance of Community Health Plans ("AICP"). At the conference, he spoke with a colleague from IHC. (Relator believes the IHC executive was the Chief Executive Officer.)

84.     The IHC executive told Armstrong about an exciting opportunity with a new IHC subsidiary, DxID.  He reported that IHC had made a lot of money using DxID's risk adjustment methodology and algorithms to conduct a retrospective review of its risk adjustment claims.

85.     Upon returning from the conference, Armstrong approached GHC's Chief Financial Officer, Ric Magnuson, and instructed him to hire DxID.  After a number of meetings with senior management and with the DC Team, DxID was officially hired in November 2011 to perform a risk-adjustment data review for 2010 dates of service.

86.     Relator has heard and believes, and on that basis alleges, that DxID's contract with GHC was based, in whole or in part, on an incentive-based reimbursement, whereby DxID was paid a percentage of the value of the new risk adjustment claims it submitted.  Relator understands that DxID submitted approximately $12 million in new risk adjustment claims for 2010 for GHC, and was paid approximately $1.5 million in incentive compensation.

VI.     **DEFENDANTS DEFRAUD THE UNITED STATES**

87.     Defendants have engaged in a deliberate scheme to defraud the United States by submitting thousands of false claims for risk adjustment payments on behalf of both GHC and IHC.  Defendants submitted and caused the submission of these false claims (and conspired to do the same) even though they knew that the patients upon whom the claims were based did not have the claimed diagnoses, had not been treated for those diagnoses in that year, or were otherwise ineligible for risk adjustment payments under CMS rules.

88.     Defendants have "upcoded" the risk adjustment claims they submitted to Medicare, claiming that a patient had been treated, in the relevant time period for: (a) a diagnosis that the patient did not have; (b) a more severe diagnosis than the one the patient had; and/or (c) a diagnosis that the patient may have previously been treated for, but which was not treated in the relevant year.

89.     Defendants have also submitted risk adjustment claims even though the member's physician did not diagnose the patient as having the condition in question or did not, according to his or her own records, treat the patient for the condition in question during the relevant year.  Notwithstanding these facts, and contrary to Medicare rules, Defendants submitted risk adjustment claims supported only by vague references in the patient's chart or documents that CMS rules plainly state may not be used to substantiate risk adjustment claims.  Even worse, in some cases Defendants submitted risk adjustment claims even though the patient's physician explicitly stated in his or her treatment notes that the patient did not have and/or had not been treated for the exact condition Defendants claimed.

90.     Defendants have also refused to correct previously submitted risk adjustment claims even though the Defendants knew, or should have known, that those claims were false.

91.     In this manner, Defendants have fraudulently caused CMS to pay thousands of false claims for risk adjustment payments worth millions of dollars.

A.    DxID's "Audit" of GHC's Risk Adjustment Claims and Subsequent Submission of Thousands of False Claims to CMS on GHC's Behalf

92.    As noted above, in approximately November 2011, GHC hired DxID to conduct a retrospective review of its risk adjustment claims for 2010 dates of service. Under CMS rules, any changes to claims for 2010 dates of service were due by January 31, 2012.  Thus, DxID worked for less than three months to identify as many additional diagnosis codes as possible.

93.    Early on, it became clear to Relator and others on the DC Team that DxID's review process did not comply with CMS rules.  DxID proposed using invalid documentation sources, such as "problem lists," to support new risk adjustment claims. DxID also proposed submitting risk adjustment claims whenever a patient <u>had</u> a diagnosis – regardless of whether the patient had been <u>treated for</u> the condition.

94.    To prevent Relator or others connected with her IHDA department from enforcing CMS rules (as they had done with the prior vendor, Leprechaun), GHC leadership directed that DxID bypass IHDA when submitting its new risk adjustment claims.  Instead of using GHC's standard process for risk adjustment claims – which included review by IHDA – GHC's leadership directed DxID to create a file of the new risk adjustment claims in a format ready for submission to CMS, and then to submit these claims through GHC's Finance and Decision Support ("FDS") department, in effect creating an end-run around IHDA and GHC's established channels for submission of risk adjustment data to CMS.  The FDS department is run by GHC's head of Medicare Finance & Decision Support, Debbie Sather, who has long complained that IHDA was

being "too conservative" by following CMS rules for coding and risk adjustment claims submission.

95.     Prior to January 31, 2012, DxID submitted 4,578 new diagnosis codes for risk adjustment claims to CMS on GHC's behalf.  In all, DxID reviewed 15,875 patient charts to find those 4,578 new claims.

96.     In a February 2012 PowerPoint, DxID presented its results to the DC Team.  SeeExhibit 1, PowerPoint Presentation, incorporated herein.  In that presentation, DxID identified the top "finds" from its review – meaning the highest volume codes that risk adjust – including: (1) Old Myocardial Infarctions; (2) polyneuropathy; (3) vascular disease; (4) Chronic Kidney Disease ("CKD"); and (5) Chronic Obstructive Pulmonary Disorder ("COPD").

97.     In a corresponding document, "DxID Post-2010 Chart Review Outcomes," DxID expanded on the procedures it used during the 42-day chart review cycle for GHC.  Specifically, it listed by HCC the number of GHC members affected by the review.  This list summarized the number of new diagnosis codes that fell into each HCC that were submitted to CMS as a result of the review.   See Exhibit 2, DxID Chart Review Outcomes, incorporated herein, page 4.

98.     After DxID disclosed its results and methods to the DC Team, Relator became concerned about the findings.  Given her role overseeing GHC's own internal audit and review processes for risk adjustment claims, she knew the error rate in the charts was not as high as DxID represented.  DxID found a new diagnosis code for every

three to four charts it reviewed – a number completely inconsistent with the Relator's years of experience doing chart reviews for GHC.

99.     Moreover, in the Chart Review Outcomes document, DxID also outlined the coding and audit rules it used to identify new risk adjustment claims for GHC. Relator identified numerous errors in DxID's application of CMS coding rules.  For example, CMS guidelines state that a "problem list" (a part of the medical record that often contains notations about diagnoses that a patient may have, may once have had, or are otherwise of interest to the provider) may only be used as the basis for a risk adjustment claim if it shows "evaluation and treatment for each condition that relates to an ICD-9 code on the date of service, and it must be signed and dated by the physician." Participant Guide at 7-17; Exhibit2 at 17.  DxID, on the other hand, applied a rule whereby the mere presence of a diagnosis in the problem list was sufficient to justify a risk adjustment claim – even in cases where the providers' notes explicitly state that the patient did not have that condition.

100.     Similarly, DxID's Chart Review Outcomes presentation to GHC states that a diagnosis may be submitted for a risk adjustment claim as long as there is a laboratory, radiology, or other diagnostic test result in the patient's chart that has been signed by a physician – regardless of whether the physician treated the patient for that condition in the year in question.  Seeid. at 6; seealsoid. at 16 ("laboratory results indicating hypoxemia that are documented in a dated medical record signed by a provider relevant for risk adjustment should be considered for the purposes of risk adjustment"). CMS rules plainly state that laboratory, radiology and other diagnostic test results may

not be used as the sole support for risk adjustment claims.  Instead, a qualified provider must actually treat the patient for the condition in question in the relevant year.

101.    DxID policies also state that a risk adjustment claim is to be submitted based on claims for durable medical equipment as long as the initial order for the equipment required a physician to document its medical necessity.  See id. at 16 ("If a Medicare Advantage organization uses clinical guidelines that require clinical evidence of hypoxemia to provide home oxygen, then the use of continuous oxygen should be considered for the purposes of risk adjustment.")  Again, however, CMS rules provide that a risk adjustment claim may only be submitted if a physician or hospital treated the patient in a face-to-face visit in the year in question.  See Participant Guide at 7.1.5.  Without such a face-to-face visit, the existence of a prior certification of the existence of a diagnosis is not enough to support a risk adjustment claim, even when combined with current treatment through durable medical equipment.

102.    Throughout the presentation, DxID makes clear that its approach looks only at whether the patient has the diagnosis, not whether they were treated for the condition by a qualified provider.  See, e.g., id. at 8 ("The Plan has to substantiate, from a clinical and coding standpoint, that the patient has the disease and that the medical record supports the fact that they do.").

103.    Relator asked for permission from her superiors to review the diagnosis codes identified by DxID.  She was provided with a copy of the over four thousand codes that had been submitted to CMS as a result of the review process, and the corresponding patient number and dates of service.  Together with her physician partner, Dr. Don

Rappe, Relator began a code-by-code review of the new diagnoses to look for support in the medical record.

104.    Immediately, Relator and Dr. Rappe began finding systematic problems with the diagnosis codes.  Claims were purportedly justified by improper documentation, if there was any documentation at all.  Relator and Dr. Rappe initially reviewed 117 charts.  Of the charts reviewed, Relator and Dr. Rappe agreed with only 27 (23%) of the codes submitted to CMS.  An additional three percent of the codes reviewed had previously been coded and submitted by GHC.  Based on their professional experience, Dr. Rappe and the Relator concluded 74% of the codes submitted did not have sufficient documentation to justify submitting the diagnosis.  The majority of these false claims (42 claims or 36% of the total) were based solely on the fact that the diagnosis was listed in the problem list – there was no other reference to the diagnosis in the medical record.  In other instances, the new diagnosis codes had no support whatsoever (5%), were based solely off test results (4%), or were based off a problem list from a visit with an improper provider (3%).

105.    In addition to fraudulently increasing new diagnoses, DxID failed to remove previously submitted incorrect diagnoses.  The only codes DxID "deleted" were ones it had added, and later determined to be unsupported.  GHC submitted some of those codes despite DxID's reservations.  See Exhibit 3 (email and redacted spreadsheet of "delete" codes).  DxID did not remove, or recommend GHC remove, any codes where the provider originally included the incorrect diagnosis.

106.    This failure to delete previously submitted codes that were not supported by the medical record is consistent with DxID's general policy.  When DxID was first explaining its procedures to the DC Team, a member of the team asked DxID whether they deleted previously submitted codes found to be incorrect.  DxID stated that it neither looked for, nor if it found did it delete, any previously submitted incorrect claims.

107.    After her review of 117 new diagnoses from DxID, Relator presented her findings to her superiors at GHC in March 2012.  She specifically highlighted the lack of proper documentation and prevalence of clearly erroneous diagnoses.  She also reported that DxID had "added" codes that had previously been submitted to CMS by GHC.  GHC took no action to inform CMS of the mistakes, nor did it suggest a broader review of the findings.  The only concern her superiors expressed was that GHC had overpaid DxID for those codes that had already been submitted.  It was due to this concern, not any concern for accuracy of the truly new claims, that Relator's superiors suggested she continue her review of the 4,500 diagnoses.

108.    Even more, despite Relator's warnings and its knowledge of DxID's remarkable error rate in DxID's submission to CMS for the 2010 dates of service, GHC hired DxID to conduct a more extensive review of risk adjustment claims for 2011 dates of service.

109.    This new review process will likely generate more unsubstantiated codes than the previous review.  GHC has suggested DxID begin coding from two sources of documentation previously rejected by GHC and DxID.  The two sources GHC has suggested drawing codes from are notations in the medical record that indicate a

diagnosis is "probable, likely, or suspected" and coding from incidental findings on the medical records.  Coding from either source is expressly prohibited by CMS.  <u>Participant Guide</u> 6.4.2 (Unconfirmed Diagnoses).

110.    In addition, DxID has indicated that in certain cases it plans to try to get providers to submit "addenda" to patients' medical records to support additional risk adjustment claims.  CMS rules provide that such supplementation may only occur within 30 days of the date of service.  However, DxID has indicated that its policy is to solicit, and base risk adjustment claims on, addenda as long as they are received before the claims submission period closes for the year in question – which may be as much as nearly two years after the date of service.

111.    GHC leadership has also been pressuring its internal coding team to adopt DxID's lax documentation standards for its own work.   GHC has been conducting internal meetings regarding the coding policies DxID applied in its review, to determine whether or not to adopt the policies within GHC's internal review procedures.  So far, although Debbie Sather has advocated for the more aggressive procedures, other individuals within GHC have refused to adopt the new policies.  Specifically, Rhona Moses, a certified coder, in a meeting in early March 2012, expressed dissatisfaction with the new coding procedures and suggested that they were not consistent with coding guidelines with which CMS requires MA plans to comply.  She has refused to code according to DxID's standards.

112.    Relator has continued to try to get GHC to reverse course and delete these false and fraudulent claims.  On April 4, 2012, she submitted to DxID a list of 40 of the

new risk adjustment claims for further review.  Her superiors did not allow her to submit all of the erroneous claims she had found – they only authorized her to seek reconsideration by DxID of this limited set.  For example, notwithstanding CMS's clear rules, GHC decided to adopt DxID's policy of submitting claims based solely on a reference in the patient's "problem list."

### B.  Examples of Specific False Claims Submitted By DxID and GHC

113.  At the end of January 2012, DxID submitted false risk adjustment claims to CMS on GHC's behalf, and with GHC's consent, for the following patients.  (These patients are identified in this complaint by anonymous references, Patient A, Patient B, etc. to protect their confidentiality.  Relator has in her possession and will provide to the United States, as part of her statutory disclosure, more specific identifying information for each of these patients.  Such additional detail is incorporated into this complaint by reference to the extent required by Federal Rule of Civil Procedure 9(b) and as allowed by federal and any relevant state privacy statutes and rules.)

114.  **Patient A** had a routine medical examination on September 2, 2010.  In the course of his visit, the doctor used a common function of the Electronic Medical Record ("EMR") software to insert the text of the patient's "Problem List" into the treatment notes for that visit.  In Relator's experience, doctors often use this function to add the problem list into the text of their notes in the EMR because doing so allows them to review the problem list while composing their treatment notes – without having to close their notes and open the problem list each time they wish to reference it.  The problem list mentioned a diagnosis of "Major Depressive Disorder, Recurrent Episode,

Mild [diagnosis code 296.31]."  This indicated that at some point in the past (in this patient's case, back in May 2004) a doctor had diagnosed this patient with the specified condition.  The problem list does not necessarily correspond to the conditions that patient currently has, nor to conditions the doctor actively treated in the face-to-face visit.

115.   During the course of Patient A's September 2, 2010 visit, the doctor specifically evaluated the patient's mood, noting "[the patient]does not have much in the way of depression in fact has an amazingly sunny disposition." (emphasis added).  The doctor concluded the major depressive disorder was "resolved."  After that visit, the doctor removed the diagnosis from the problem list.

116.   Despite this clear notation by the treating physician that the patient was not suffering from major depression, and the fact that the doctor even removed the diagnosis from the problem list, DxID coded Patient A for Major Depressive Disorder [diagnosis code 296.31].  Because the patient neither had nor was treated for a Major Depressive Disorder in 2010, the risk adjustment claim DxID submitted, on GHC's behalf and with its permission, for that diagnosis was false and fraudulent within the meaning of the False Claims Act.

117.   **Patient B** was treated on April 5, 2010 for emergency care as a result of a choking incident that occurred while the patient was eating a turkey dinner.  The patient underwent an operation to have the blockage removed and received follow-up care related to the incident.  The doctor noted that the patient reported: "that she has lost about 10-20 pound recently and has not been eating very well."  However, the doctor did not diagnose the patient as having malnutrition (orcachexia) – a very significant condition

where the patient has lost so much weight that his or her body has essentially begun to break down existing tissue to meet its caloric needs.  On April 15, 2010, Patient B saw a nutritionist.  The nutritionist noted the past weight loss, but was not concerned with it, as the patient had gained five pounds since a previous visit.  Because the patient was never diagnosed with (let alone treated for) cachexia [diagnosis code 799.4], the risk adjustment claim DxID submitted, on GHC's behalf and with its permission, for that diagnosis was false and fraudulent within the meaning of the False Claims Act.

118.  **Patient C** was treated on March 22, 2010 for diabetes.  When diabetes is linked with nerve issues in the extremities, it is called "diabetic neuropathy."  A patient with diabetes without other complications is grouped into HCC 19.  A patient with diabetes so serious that it has also caused diabetic neuropathy falls into the substantially more lucrative HCC 16.  For Patient C, diabetic neuropathy was listed on the problem list.  However, the doctor examined the patient and determined that "She does not have significant diabetic neuropathy."  (emphasis added).  Contrary to this express statement to the contrary by the treating physician, DxID submitted a risk adjustment claim to CMS for Patient C for diagnosis code 357.2 Polyneuropathy in Diabetes.  Because Patient C was not diagnosed with (let alone treated for) diabetic neuropathy in 2010, the risk adjustment claim DxID submitted, on GHC's behalf and with its permission, for that diagnosis was false and fraudulent within the meaning of the False Claims Act.

119.  **Patient D** was treated on November 17, 2010 for diabetic neuropathy.  In addition to diabetes, the problem list also indicated the patient had Chronic Kidney Disease ("CKD").  While kidney disease can be caused by diabetes, resulting in a

condition called diabetic nephropathy, a diabetic patient with CKD does not necessarily have diabetic nephropathy. In many cases the CKD and the diabetes are independent of each other. On the other hand, in those cases where a patient's diabetes is so severe that it causes CKD, that indicates the patient is so ill that he or she is likely to be substantially more expensive to treat. Accordingly, the HCC for diabetes with diabetic nephropathy is significantly more lucrative than the HCC for diabetes alone.

120.    In Patient D's case, the doctor tested the patient specifically for albumin, a protein indicating the presence of diabetic nephropathy. The doctor explicitly found the patient "[did] not have significant diabetic nephropathy." (emphasis added) Despite the fact that the diagnosis had specifically been ruled out by a physician on the referenced visit date, DxID added and submitted code 250.4 Diabetes with Renal Manifestations. Because Patient D was not diagnosed with (let alone treated for) diabetic nephropathy in 2010, the risk adjustment claim DxID submitted, on GHC's behalf and with its permission, for that diagnosis was false and fraudulent within the meaning of the False Claims Act.

121.    **Patient E** was treated on February 11, 2010 by a family practice physician for cardiology-related issues. During the visit, there was no mention of or reference to an old myocardial infarction ("old MI"). Patient E had received an ECG in 2009 that revealed no old MI. It was not until an ECG was performed on January 26, 2011 – nearly a year after the visit DxID used to support the risk adjustment claim and a month after the end of the service year – that there was any indication the patient had old MI. Submitting a risk adjustment claim for old MI based on the February 2010 visit is triply wrong,

because: (1) the treating physician gave no indication that she had diagnosed the patient with an old MI, let alone that such a diagnosis had affected her treatment of the patient; (2) the January 2011 ECG was a diagnostic test performed by a technician, and was not treatment provided in a face-to-face encounter with a qualified provider as required to support a risk adjustment claim ; and (3) the January 2011 ECG report fell outside of the relevant time period (calendar year 2010).    Nevertheless, DxID submitted a risk adjustment claim for diagnosis code 412 Old MI.   Because the patient was never diagnosed with (let alone treated for) an old MI during 2010, the risk adjustment claim DxID submitted, on GHC's behalf and with its permission, for that diagnosis was false and fraudulent within the meaning of the False Claims Act.

122.    These are but a select few representative examples of the types of false risk adjustment claims that DxID and GHC conspired to submit and did submit to CMS.

123.    GHC estimated that CMS would pay it more than $12 million for the risk adjustment claims submitted by DxID on GHC's behalf for the 2010 service year.  If 74% of those claims were erroneous (consistent with the error rate Relator has found during her review), GHC and DxID have submitted and conspired to submit more than $8 million in false claims to the United States.

   **C.     DxID and IHC Submitted and Conspired to Submit False Risk Adjustment Claims on IHC's Behalf**

124.    As noted above, GHC learned about DxID when an IHC executive told GHC's CEO that IHC had been using DxID's algorithms and methodologies in the past and had seen a significant positive financial impact.

125.     Because DxID was only spun off from IHC in the Fall of 2011 – mere months before it began working for GHC – it is highly likely that the algorithms and procedures DxID used to review GHC's risk adjustment claims are the same as the procedures used to review GHC's claims.

126.     For these reasons Relator believes, and on that basis alleges, that IHC and DxID have submitted and conspired to submit false risk adjustment claims to CMS on IHC's behalf using the same or substantially similar fraudulent processes and procedures as those DxID used in connection with its fraudulent review and submission of risk adjustment claims for GHC.

## COUNT I

### Substantive Violations of the Federal False Claims Act
### 31 U.S.C. §§ 3729(a)(1)(A)–(C), (G)

127.     Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 126 of this Complaint.

128.     This is a claim for treble damages and forfeitures under the Federal False Claims Act, 31 U.S.C. §§ 3279–33, as amended.

129.     Through the acts described above, Defendants, their agents, employees, and co-conspirators, knowingly presented, or caused to be presented, to the United States false and fraudulent claims, and knowingly failed to disclose material facts, in order to obtain payment or approval from the United States and its contractors, grantees, and other recipients of its funds.

130.     Through the acts described above, Defendants, their agents, employees, and co-conspirators, knowingly made, used, and caused to be made and used false

records and statements, which also omitted material facts, in order to induce the United States to approve and pay false and fraudulent claims.

131.    Through the acts described above, Defendants, their agents, employees, and co-conspirators, knowingly made, used, and caused to be made and used false records and statements material to an obligation to pay and transmit money to the United States, and knowingly concealed and improperly avoided and decreased an obligation to pay and transmit money to the United States.

132.    Through the acts described above, Defendants, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the United States and to deceive the United States for the purpose of getting the United States to pay or allow false or fraudulent claims.

133.    The United States, unaware of the falsity of the records, statements, and claims made and submitted by Defendants, their agents, employees, and co-conspirators, and as a result thereof, paid money that it otherwise would not have paid.

134.    By reason of the payment made by the United States, as a result of Defendants' fraud, the United States has suffered millions of dollars in damages and continues to be damaged.

## **PRAYER**

WHEREFORE, qui tam plaintiff Teresa Ross prays for judgment against the defendants Group Health Cooperative, Independent Health Corporation, DxID LLC, Dr. John Haughton, and Betsy Gaffney ("Defendants") as follows:

1.    That Defendants cease and desist from violating 31 U.S.C. §§ 3729–33.

{00040972; 4}                                        43

2.      That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained as a result of Defendants' actions in violation of the Federal False Claims Act, as well as a civil penalty of $11,000 for each violation of 31 U.S.C. § 3729;

3.      That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the Federal False Claims Act;

4.      That Relator be awarded all costs of this action, including attorneys' fees and expenses; and

5.      That the United States and Relator receive all such other relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands trial by jury.

DATED: April 11, 2012                    Respectfully submitted,

By:  /s/ Brian M. Melber

Rodney O. Personius
Brian M. Melber
Personius Melber LLP
2100 Main Place Tower
Buffalo, NY 14202

Tel: (716) 855-1050
Fax: (716) 855-1052
rop@personiusmelber.com
bmm@personiusmelber.com

Timothy P. McCormack
Phillips & Cohen LLP
2000 Massachusetts Ave., NW
Washington, DC 20036
Tel: (202) 833-4567
Fax: (202) 833-1815
tmccormack@phillipsandcohen.com

Attorneys For *Qui Tam* Plaintiff-Relator [Under
Seal Relator A]