# Ex. E

## CLIENT SERVICE PROVIDER AGREEMENT (PHI)

THIS AGREEMENT ("Agreement") is entered into on the 14th day of December, 2011, between Group Health Cooperative ("Client"), with principal offices at 320 Westlake Avenue North, Suite 100, Seattle, WA 98109 and DxID LLC ("DxID"), a New York limited liability corporation with principal offices at Piano Works Office Park, 349 West Commercial Street, Suite 2000, East Rochester, NY 14445.

Client and DxID wish to enter into this Agreement on the terms and conditions set forth below. Accordingly, the parties hereto agree as follows:

1.      **Term of Agreement (Term).** The initial term of this Agreement shall commence on December 14, 2011 and expire on the date of final payment to DxID for the 2012 Medicare Advantage Premium Year for Services (as defined below) related to 2011 and 2012 Medicare Advantage Premium Years (the "Initial Term"), subject to the Parties rights to terminate this Agreement pursuant to Section 4. The parties may thereafter agree in writing to renew this Agreement for subsequent Medicare Advantage Premium Years (each a "Renewal Term"). The Initial Term and Renewal Term are collectively referred to as the "Term".

2.      **Description of Services.** During the Term of the Agreement, DxID will provide the services set forth on Schedule A ("Services"), as amended from time to time in writing by mutual agreement of the parties, which is attached hereto and is incorporated herein by reference. Client will cooperate with DxID in DxID's provision of the Services and, without limitation of the foregoing, fulfilling the obligations set forth as Section 13 "Roles & Responsibilities", on Schedule A. Client represents and warrants that all information provided by it to DxID in connection with the Services is an accurate and complete representation of information available in Client's record systems as of the date provided.

3.      **Compensation.** Client shall pay DxID as specified in Schedule B, as amended from time to time in writing by mutual agreement of the parties, in no event later than the time specified in Schedule B "Payment Terms".

4.      **Termination of Agreement.** Either party may terminate this Agreement as of the effective date of termination, without cause, with prior written notice of at least sixty (60) days to either party. Either party may terminate this Agreement at any time for cause, upon providing written notice of termination, based on a material breach by the other party of a term or condition of this Agreement which is not cured by the breaching party within thirty (30) days of receipt of notice describing the breach in reasonable detail, except that if the breaching party reasonably requires more than thirty (30) days to cure the breach, submits a plan and timetable acceptable to the other party for curing the breach and diligently pursues the plan and timetable, the 30-day time limit may extended (but in no event beyond sixty (60) days without the prior written consent of the parties). In addition, Client may terminate this Agreement in accordance with the Business Associate Agreement referred to in Section 5 of this Agreement.

5.      **HIPAA Business Associate; Risk Assessment; External Audit.** Client will make available and/or transfer to DxID information that is individually identified protected health information as defined in the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") in connection with the provision of the Services. As to such information, DxID will

comply with the provisions of the Business Associate Agreement attached to this Agreement as Schedule C.

Client, through its information security team, may perform one or more risk assessments of DxId concerning DxID's provision of the Services consistent with Client's standard processes and procedures to determine whether DxID's provision of the Services is adequately secure and, if not, whether and what modifications are required.  If Client conducts such a risk assessment, Client shall prepare a report summarizing the results of the risk assessment and the Parties will meet and discuss, where necessary, how to correct any defects or gaps identified and document in writing a mutually agreeable plan to remedy such defects or gaps (the "Corrective Action Plan").  Such defects and gaps shall be remedied by DxID in accordance with the Corrective Action Plan at DxID's expense. DxID agrees to work with Client to ensure that DxID's provision of the Services is sufficiently secure according to Client's security standards.

Immediately upon execution of this Agreement, DxID will initiate a Pre-Assessment for Security in 2011 as a first step toward its SSAE-16 audit process. This reflects DxID's understanding that, of the five Trust Criteria covered under a Service Organization Control 2, type II ("SOC") report, Security is most germane to its customers' business operations.

It is expected that the Security Pre-Assessment will carry over into 2012. At the conclusion of that Pre-Assessment, DxID will be provided with an internal gap analysis formally prepared by a nationally recognized third-party auditor that identifies areas of remediation that we will pursue in 2012.

In the fourth quarter of 2012, DxID will produce a report per Service Organization Control 2, type II ("SOC") under the "Trust Services Principles, Criteria, and Illustrations for Security, Availability, Processing Integrity, Confidentiality, and Privacy (AICPA, Technical Practice Aids)" standards and the "Generally Accepted Privacy Principles" as established by the AICPA and CICA, that is focused on Security, based upon a 2012 audit period.

This Security-focused report will be conducted by a nationally recognized third-party auditor, with respect to the Service, reflecting such third-party auditor's unqualified opinion as to DxID's accomplishment of the audit's scoped objectives. Evidence of this report will be provided to Client at DxID's expense.

Additionally, during 2012 we will perform Pre-Assessments for Availability, Processing Integrity, Confidentiality, and Privacy, with a goal of building SOC 2 reports that incorporate these trust criteria as we move into 2013 and beyond.

Client reserves the right to require, and DxID shall provide at DxID's expense, commercially reasonable remediation of: (i) any identified control gaps in the controls environment between Client's controls structure and those applied with respect to the Services, or (ii) any inadequacy with the scope of the audit (as determined by Client). Thereafter, in each successive Renewal Term, DxID shall provide annually, at DxID's expense, a SOC Report performed by a nationally recognized third-party auditor, reflecting such third-party auditor's unqualified opinion as to DxID's accomplishment of the audit's scoped objectives. The audit report shall be issued annually in the same month as established from the first audit occurrence.

This Section 5 shall survive the termination of the Agreement as provided in Schedule C.

6.      **Assignment.** This Agreement is intended to secure the services of DxID and shall not be assigned, sublet, delegated, subcontracted or otherwise transferred by DxID without prior written consent of Client.   Notwithstanding the foregoing, DxID may, upon prior written notice to Client: (1) utilize individual independent contractors with whom DxID has contracted directly to provide specific components of the Services, such as auditing, under the general supervision of DxID, provided that DxID shall remain responsible for the compliance of such independent contractors with the relevant terms of this Agreement; or (2) collaterally assign its rights under this Agreement to a bank or other financial institution as part of a financing arrangement, provided that DxID shall remain responsible for the compliance of its obligations under the relevant terms of this Agreement or (3) assign its rights under this Agreement to a parent, subsidiary or affiliate of DxID.

7.      **Non Solicitation.** During the Term of this Agreement, and for a period of twelve (12) months after expiration or termination of this Agreement, neither Party shall directly or indirectly offer employment to, or conduct or participate in discussions concerning the employment of any individual who is, or was within the six (6) month period preceding such offer or discussions, an employee of either party or any of its affiliates or subsidiaries involved in performing services hereunder: provided however, that the foregoing restriction shall not preclude either party from employing any such employee who seeks employment in response to any general advertisement or other similar method and not in response to any solicitation efforts directly or indirectly of either party.

8.      **Indemnification.** DxID, shall defend, indemnify and hold harmless Client from and against any and all claims, damages, losses, fines or expenses of any kind or nature whatsoever, including reasonable attorney's fees, court costs, expert witnesses and expenses, arising solely and directly out of: (1) DxID's, or its employees', agents', representatives', and contractors' or subcontractors' knowing or negligent breach of privacy, security or confidentiality obligations under Section C of this Agreement or applicable law: (2) any knowing or negligent act or omission of DxID, or its employees, agents, representatives, contractors and subcontractors in the performance of this Agreement; or (3) any breach of warranty by DxID.  Client agrees: (a) to promptly notify DxID in writing by certified mail of such claims, suits or proceedings; (b) to give DxID the right to control and direct, subject to Client's approval (which shall not be unreasonably withheld), investigation, preparation, defense and settlement of any claims, suits or proceedings; and (c) to give assistance and full cooperation for the defense of same.  Client shall defend, indemnify and hold harmless DxID from and against any and all claims, damages, losses, fines or expenses of any kind or nature whatsoever, including reasonable attorney's fees, court costs, expert witnesses and expenses, arising solely and directly out of any knowing or negligent act or omission of Client, or its employees, agents, or representatives in the performance of this Agreement.  DxID agrees: (a) to promptly notify Client in writing by certified mail of such claims, suits or proceedings: (b) to give Client the right to control and direct investigation, preparation, defense and settlement of any claims, suits or proceedings: and (c) to give assistance and full cooperation for the defense of same.  Notwithstanding the above provision, Client and DxID agree that this Agreement is not intended to create any legal relationship between the parties other than that of independent parties contracting with the other solely for the purposes of effecting this Agreement.

3

9.    **Ownership.** Subject to Client's right to use the reports and the RAPS submissions provided to it by DxID in accordance with the terms of this Agreement and only for their specific intended purpose, DxID will exclusively own all rights, title and interest in and to the Software, the Tools, and any other software programs or tools, utilities, technology, processes, inventions, devices, methodologies, specifications, documentation, techniques and materials of any kind used or developed by DxID or its personnel in connection with performing Services (collectively "DxID Materials"), including all worldwide patent rights (including patent applications and disclosures), copyright rights, trade secret rights, know-how and any other intellectual property rights therein. The "Software" means DxID's software for aggregating medical records from patient encounters and applying an analytical rule-based artificial knowledge engine to interpolate these encounters, add proper coding specificity, identify coding errors, and generate an auditable billing/coding file for reimbursement, sometimes referred to as DxID Analytics and a separate software program related to the auditing process and the addendum note process sometimes referred to as the Electronic Audit Tool, in including the source code or object code thereof, and any documentation, specifications, data, reports, formulae, flowcharts, designs, processes, procedures, data models, data formats, field or record layouts, or improvements related thereto. The "Tools" means DxID's forms, templates, processes, business methods, and other means for providing the Services which are described in Schedule A, in Sections (1) (a) through (1) (f), inclusive, including audit forms and addendum note forms and related processes and their resulting content, and any scientific or technical data, information, concept, design, process, procedure, formula, or improvement and any intellectual property, know-how, and trade secrets, embodied in or related to the Software or the Tools, whether or not patentable or copyrightable.

10.    **Confidential Information.** "Confidential Information" means (i) information of Client, which may or may not be specifically identified as confidential information of Client, other than the Protected Health Information, which the Parties acknowledge and agree is solely governed by the provisions of Section 5 and Schedule C, (ii) the DxID Materials and (iii) any other business or technical information of either Client or DxID that is reasonably designated by the owning Party as "confidential" at the time of disclosure in writing or that due to its nature or under the circumstances of its disclosure, would be understood by a reasonable recipient in the health care services or health care information industry should be treated as confidential. Confidential Information of a Party includes any and all notes, analyses, compilations, studies or other material prepared by the other Party containing or based, in whole or in part, on any Confidential Information of the Party whether disclosed or provided in oral, written, graphic, photographic or any other form.

11.    **Exclusions.** Confidential Information as defined in Section 10 (specifically excluding Protected Health Information governed by Paragraph 5 and Schedule C) does not include information that: (i) is or becomes generally known to the public through no fault or breach of this Agreement by the receiving party; (ii) is rightfully known by the receiving party at the time of disclosure without an obligation of confidentiality; (iii) is independently developed by the receiving party without use of the disclosing party's Confidential Information, as evidenced by written documentation maintained in the normal course of business; (iv) is rightfully received by the receiving party from a third party without restriction on use or disclosure; or (v) is disclosed with the prior written approval of the disclosing party.

12.    **Use and Disclosure Restrictions.** Each party will not use the other party's Confidential Information except as necessary for the performance of the Party's obligations under this

4

Agreement or enforcement of this Agreement and will not disclose such Confidential Information to any third party except to those of its employees and permitted subcontractors who have a bona fide need to know such Confidential Information and who have signed a written confidentiality agreement containing the same or similar terms, conditions and obligations contained herein for the performance of the Parties obligations under this Agreement or enforcement of this Agreement.  Each party will employ reasonable technical, administrative and physical safeguards to protect the other party's Confidential Information from unauthorized use or disclosure, including, but not limited to, all steps that it takes to protect its own information of like importance.  Except as to Protected Health Information governed by Schedule C, the foregoing obligations will not restrict either party from disclosing the other party's Confidential Information: (i) pursuant to the order or requirement of a court, administrative agency, or other governmental body, provided that the party required to make such a disclosure gives reasonable notice to the other party to enable it to contest such order or requirement: (ii) to its legal or financial advisors subject to the execution of a written confidentiality agreement; and (iii) subject to customary restrictions, to present or future providers of venture capital and/or potential private investors in or acquirers of such party, subject to the execution of a written confidentiality agreement.

13.    **Choice of Law.**  This Agreement shall be governed by the laws of the State of Washington notwithstanding conflict of law rules, unless otherwise preempted by applicable federal law.

14.    **Arbitration.**  Any controversy or claim arising out of or relating to this Agreement shall be finally settled by binding arbitration under the rules of the American Health Lawyers Association ("AHLA") Dispute Resolution Service utilizing one (1) arbitrator who shall be chosen from a list of arbitrators maintained by the AHLA.  Arbitration shall be heard in Seattle, Washington.  The parties agree that punitive damages may not be awarded at arbitration.  The parties shall split equally any applicable arbitrator fees and costs.

15.    **Notices.**  Whenever under this Agreement one party is required to give notice to the other, such notice shall be deemed given if mailed by First Class United States Mail, postage prepaid or nationally recognized overnight carrier, and addressed as follows:

| | |
|---|---|
| **Client:** | Group Health Cooperative<br>320 Westlake Avenue North, Suite 100<br>Seattle, WA 98109<br>Attn: Debbie Sather |
| With a copy to: | Group Health Cooperative<br>Legal Department<br>320 Westlake Avenue North, Suite 100<br>Seattle, WA 98109<br>Attn: General Counsel |
| **DxID:** | DxID LLC<br>Piano Works Office Park,<br>349 West Commercial Street, Suite 2000<br>East Rochester, NY  14445.<br>Attn:  Chief Executive Officer |

5

Either party may at any time change its address for notification purposes by mailing a notice stating the change and setting forth the new address.

16.    **Entire Agreement.** This Agreement, together with any Attachments or Schedules, if any, sets forth the entire agreement between the Parties respecting its subject matter and supersedes all prior negotiation and agreements between the parties relating to the subject of this Agreement. No change, waiver or discharge of obligations arising under this Agreement shall be valid unless in writing and executed by the Parties. Waiver of a term, covenant or obligation under this Agreement shall not be deemed a waiver of any subsequent breach of the same or any term, covenant or obligation under this Agreement.

17.    **Compliance.** The parties agree to comply with all applicable laws, rules and regulations. With regard to the laws, rules and regulations that apply to Medicare Part D and Medicare Advantage, the parties agree to the provisions set forth in Schedule D of this Agreement, which is attached hereto and is incorporated herein by reference. If any Medicare Part D and, or Medicare Advantage Law, rule, regulation or guidance changes in a material way and makes the services provided under this Agreement illegal, impossible or unprofitable, either party may terminate this agreement as of the compliance date or issuance date of such law, regulation or guidance.

18.    **Public References; Use of Marks.** DxID shall not make any references to its status as a Client vendor, authorized agent or representative in any form of public advertising or media, such as print, television, radio or trade publications without Client's prior written consent. Neither party shall use any of the other party's trademark, service mark, trade name or copyrighted material without the other party's prior written consent.

19.    **Warranty.** DxID warrants that: (1) its employees who are assigned to perform work hereunder shall have the proper skill, training and background so as to be able to perform in a competent and professional manner, in compliance with applicable laws and rules, including, without limitation those laws and rules set forth in Section 17, and that all work will be so performed; (2) it has full authority to enter into this Agreement; (3) DxID does not infringe on any United States copyright, patent or other proprietary right, or violate any trade secret; (4) no gifts or gratuities were provided to Client in consideration of entering into this Agreement; (5) its personnel, when working at Client's premises, will conduct themselves in a professional manner, will use commercially reasonable efforts to minimize disruptions to Client's business and agree to abide by Client's confidentiality and security practices when working at Client's premises or when visiting physician offices.

20.    **Contract Modifications for Prospective Legal Events.** In the event any state or federal laws or regulations, now existing or enacted or promulgated after the date hereof, are interpreted by judicial decision, a regulatory agency or experienced health care legal counsel to either Party in such a manner as to indicate that this Agreement or any provision hereof may be in violation of such laws or regulations, the parties shall amend this Agreement as necessary to avoid such violation, while preserving the underlying economic and financial arrangements between them and without doing substantial economic detriment or creating substantial legal jeopardy to either party; provided that if it is not possible to continue this Agreement without substantial economic detriment or legal jeopardy to a party, that Party may terminate this agreement on sixty (60) days' notice to the other Party.

21.    **Waiver.** No delay or failure to require performance of any provision of this Agreement shall constitute a waiver of that provision as to that or any other instance. Any waiver granted by a party must be in writing, and shall apply solely to the specific instance expressly stated.

22.    **Independent Contractors.** The Parties intend that the relationship between them is solely an independent contractor relationship, and that no employment, partnership, joint venture or agency relationship shall exist. DxID agrees that DxID is not entitled to, and will have no claim against Client for, any wages, salaries, bonuses, vacation pay, holiday pay, sick pay, retirement benefits, social security, workers' compensation, disability or unemployment insurance benefits, or any other employee benefits of any kind for its employees.

23.    **Survival.** The provisions of this Agreement which expressly survive termination or expiration, or which by their nature must survive termination or expiration in order to achieve the fundamental purposes of this Agreement, shall survive such termination or expiration, including but not limited to the right of DxID to receive compensation and reports and information as provided in Section 3 and Schedule B.

IN WITNESS WHEREOF, Client and DxID have caused this Agreement to be signed and delivered by their duly authorized representatives, as of the date set forth above.

**DxID LLC**

By: 
Name:  Elizabeth A. Gaffney,
Title:    CEO

Date: 

**Group Health Cooperative**

By: 
Name:  Donevan Harris
Title:    Buyer

Date: 

7

**Schedule A**
**Description of Services**

### 1.    Scope of DxID Services

DxID, a corporation focusing on quality, risk management, reimbursement and CMS compliance, (also referred to herein as "we" or "our") will provide Client (also referred to herein as "you" or "your") the opportunity to improve the quality of health care while maximizing efficiencies and risk adjusted revenues.

As part of the engagement, DxID will provide Client:

| | |
|---|---|
| A. | A complete prospective and retrospective medical record review, benchmark review and coding supplementation and editing |
| B. | Client Services Manager |
| C. | Provider education customized to Provider specific requirements, as well as an overview of results and compliance updates |
| D. | Integrated CMS compliance services |
| E. | Data retrieval support, data aggregation support, customized and standardized reporting |
| F. | RAPS creation, testing and provision |
| G. | Encounter data creation, testing, support and provision if required or requested |
| H. | Consultative support as requested related to risk management, disease management and quality |

### 2.    Project Scope Definition, Process and Timeline Overview

DxID will provide specification requirements for its recommended process operations, will identify and dedicate personnel to Client and will provide a proposed written work plan and timeline for completion of the Services for Client's review and approval immediately upon execution of the Agreement. DxID shall perform the Services in accordance with this Agreement and such work plan and timeline. In addition, DxID will analyze, incorporate and credit any information you may have already completed into our process.

### 3.    Member Specific Targeted Review

DxID will manage and complete all process functions at your discretion. DxID will provide you with fully HIPAA compliant processes and reviewable quality check roadmap. Our review process and tool is menu-driven, reliable and measurable every step of the way, virtually eliminating auditor subjectivity and allowing for transparent management of all review activity. DxID experienced Client Services Manager will be assigned to Client to:

- o  Oversee all aspects of the review and reviewers
- o  Manage review process scheduling and other Client interactions in concert with and at the direction of your staff.
- o  Act as primary liaison regarding project results.
- o  Support Client's information requirements throughout the review process.

The DxID review will be conducted for Client with:

- o  A HIPAA compliant expert review process.
- o  Experienced HCC and clinical review staff, trained in product functionality, HIPAA privacy and expected site etiquette by DxID.

8

**4.    Standard and Customized Reporting**

DxID has the capability and technology to provide extensive reporting including on demand management reporting and customized reporting at your request.

**5.    RAPS File Production and Processing**

As reviews are performed, results are converted into tested RAPS format where appropriate. Reconciliation information is secured and provided in a detailed format. These RAPS files and reports will be tested and sent immediately to Client in a CMS approved format for submission to CMS at timing preferred by Client.

**6.    Encounter Data** — As (if) Encounter Data Submission is required by CMS. DxID will provide testing, and tested files for submission for Client if requested.

**7.    ICD 10 transition** -- DxID will support Client in the transition to ICD-10 as applicable.

**8.    Medical Record Documentation**

DxID captures the pertinent diagnostic information held within the member medical record. DxID creates member diagnostic profiles and support provision of proper more complete documentation where necessary for the Plan year, to accommodate CMS requirements for the assessment of risk. DxID collects and maintains an audit trail to all identified diagnoses. All supporting documentation is available to the Client in the event of a RADV audit, and all hard copy documentation will be secured and made available to Client in support of any future RADV audit request.

**9.    CMS Validation Support**

DxID collects and secures a clear findings trail to any and every diagnosis that is prepared for submission to CMS so that a rapid and valid argument can be supplied to CMS at any request: DxID will support you on any RADV audit request, with clinical, coding and medical record documentation support at any time, for any and all CMS requests, whether submissions resulted from DxID efforts or those submitted by your Plan in the course of normal business.

**10.    Client Services Management**

An experienced DxID Client Services Manager will be assigned to Client.  Your Client Services Manager will manage all aspects of the review process, including auditors, and will facilitate and support processes to integrate the reviewed HCC data into your disease and case management programs.  Your Client Services Manager will act as primary liaison between your staff and DxID.  Your Client Services Manager will work in concert with your staff to ensure that all DxID communications incorporate and reflect your culture and approach. In the event that the employment of Client Services Manager is terminated for any reason, DxID will propose a successor Client Services Manager who is acceptable to you.

### 11.    CMS Compliance Services

DxID utilizes counsel from time-to-time to provide clarification of new CMS announcements and any resulting implications to our products and services.  Client shall use its own experienced health care counsel to advise it. DxID staff review CMS announcements to identify and evaluate impact or requirement changes to our products and services.

DxID will explain all processes and activities with Client upon the execution of this Agreement: we will not initiate any activities without prior approval by Client.

Our CMS Compliance Program includes a quality assurance program, including oversight over all activities, to ensure accuracy in preparation of any RAPS submission.

### 12.    Deliverables

DxID's Client Services Manager will deliver:

- ○ Introduction and training to your staff and physicians regarding our role in support of your Plan.
- ○ Provider education customized to your Provider specific requirements, as well as an overview of results and compliance updates to your specific needs.
- ○ Ready-to-submit RAPS files reflecting and validating activities related to our work (scheduled according to your needs).
- ○ Our work efforts will be fully transparent to you.
- ○ Customized reporting.

### 13.    Project Team & Meetings

The following key positions are assigned to this project on a non-exclusive basis:

**CEO:**  Oversees all services provided under this agreement: responsibility for management of all CMS Compliance related to work performed.

**Client Services Manager:**  Responsible for project planning, staff supervision, and primary liaison with Client staff; oversees retrieval and reporting activities. Reports to Client Executive Team and Gino Startari, Director Client Services and Sales.

**Consulting Risk Adjustment Advisor:**  Assists with CMS Compliance issues and provides clinical argument in product design.

**Clinical Review Team:**  Complete chart reviews, objectively and thoroughly according to specific guidelines.

**Other support staff – Developers / Programmers, HIPAA Consultant, Accountant, Clinical Analyst, CMS Policy Analyst.**

DxID personnel will meet (by phone or in person) with Client as reasonably requested.

**14.    Client's Roles & Responsibilities**

o    DxID will provide the services contemplated hereunder in a manner that minimizes any disruption to your staff's normal routines, while keeping you fully informed of all activities.

o    Client will provide ALL RAPS return files to DxID within (3) days of request by DxID (for the purpose of reconciliation and invoicing).

o    Client will be responsible for providing all data according to DxID specifications and verification that the benchmark data is complete (exceptions will be considered on request and with specification), due to payment terms being full risk to DxID.

o    DxID will require Client's assistance in providing appropriate liaison staff and providing and receiving data as well as physical space during the review cycle.

o    Should Client require assistance in providing any of the required data, DxID will provide an onsite programmer / data specialist to assist in extracting and formatting any required data files.

## Schedule B
### Compensation

**1.    PREMIUM YEARS 2011 and 2012:**    20% of Actual Net HCC Recoveries. "Actual Net HCC Recoveries" shall mean total actual HCC Recoveries (submissions and resulting interactions and any renal rate differential directly resulting from DxID activities). less any HCC Recoveries relating to Client activities relating to diagnoses previously submitted by other means or from other sources.

**2.    ALL PREMIUM YEARS:** DxID will refund any fees actually paid to DxID in the event, and to the extent. that the Actual Net HCC Recoveries on which such DxID fees were based are recouped by, or voluntarily repaid to CMS, based on a post-payment audit by CMS finding that the Net HCC Recovery was not documented as required by applicable CMS regulations or policies applicable to RAPS submissions. Such refund will be made within 30 days of proof of actual and final repayment by Client to CMS. Such refund is based on the percentage nature of DxID's fees and is not an admission of fault or liability by DxID.

**3.    PAYMENT TERMS:** Premium Years 2011 and 2012:    Client shall report the amount of the Actual Net HCC Recoveries to DxID within thirty (30) days after receipt or credit of HCC Recoveries from CMS (the "Actual Net HHC Recoveries Report"), and shall provide MMR. MOR and Enrollment reports (the "MMR Reports") to DxID within five (5) days after receipt from CMS. DxID shall. within ten (10) days after receipt of the Actual Net HHC Recoveries Report or the MMR Reports, whichever is later. submit an invoice to Client for the amount specified in Schedule 1. Section 1. Client shall pay such invoice, or any undisputed portion of such invoice, within thirty (30) days after receipt.

**4.    ALL-INCLUSIVE FEES:** The fees set forth in this Schedule B shall be all-inclusive of all Services provided by DxID under the Agreement (including all Schedules thereto), and there shall no additional fees or costs billed to or due or owing by Client in connection with DxID's Services. except as the parties mutually agree for services provided by DxID in addition to the scope of services under this Agreement.

12

**Schedule D**
**Medicare Compliance Provisions**

The parties shall comply with all applicable federal, state and local laws, rules, and regulations and restrictions in the conduct of their obligations under this Agreement, including without limitation:

(a)    **Laws & Rules**.  The parties agree to comply with all applicable Medicare, Medicare Advantage and Medicare Part D laws, rules and regulations and the Centers for Medicare and Medicaid Services ("CMS") instructions to the extent applicable to such Party.  (42 CFR §422.504(i)(4)(v) and 42 §423.505(i)(4)(iv)).

(b)    **Records**.  DxID agrees to comply with all applicable state and federal requirements regarding the accuracy, confidentiality and retention of records of members of Client, including the requirements established by CMS which include, but are not limited to the retention of all records for a period of ten years from the date this Agreement expires or terminates or the completion of any Medicare-related audit, whichever is later.  (42 CFR §422.504(a)(13) and §422.118).

(c)    **Monitoring of Services**.  Client has the right to monitor the performance of DxID under this Agreement on an ongoing basis under the terms and conditions of this Agreement. Such monitoring may include routine and random audits and Client shall have the right to interview DxID staff, employees and consultants who provide services hereunder.  (42 CFR §422.504(i)(4)(iii) and 42 CFR §423.505(i)(4)(iii)).

(d)    **Right to Audit**.  DxID agrees that CMS, Health and Human Services ("HHS"), and the Comptroller General of their designees shall have the right to audit, evaluate or inspect any books, contracts, medical records, patient care documentation, or other records of DxID that pertain to or are related to any aspect of the services provided under this Agreement for a period of up to ten (10) years from the date this Agreement expires or terminates, or the completion of any Medicare-related audit, whichever is later, and such other periods in excess of ten (10) years or more as defined in Medicare, Medicare Advantage and Medicare Part D laws, rules, and regulations and CMS instructions.  This provision shall survive the termination of this Agreement for any reason.  (42 CFR §422.504(e)(2) through (4), 42 CFR §422.504(i)(2)(i) and (ii) and 42 CFR §423.505(i)(2)(i) and (ii)).

(e)    **Ultimate Responsibility**.  Notwithstanding any term or provision of this Agreement, Client maintains ultimate responsibility for adhering to and otherwise fully complying with all terms and conditions of its Medicare Advantage and Medicare Part D contracts with CMS (42 CFR 422.504(i)(1) and 42 CFR §423.505(i)(1)).  DxID acknowledges and agrees that the services it provides under this Agreement shall be consistent with and shall comply with Client's contractual obligations with CMS regarding benefit plans, which are subject to Medicare, Medicare Advantage and/or Medicare Part D laws, rules and regulations and CMS instructions.  DxID agrees to cooperate with Client in meeting

14

its responsibilities under Medicare Advantage and Medicare Part D. In the event of a disagreement between Client and DxID with respect to the interpretation of Client's contractual obligations with CMS regarding benefit plans, which are subject to Medicare, Medicare Advantage and/or Medicare Part D laws, rules and regulations and CMS instructions, Client's interpretation shall control. (42 CFR §422.504(i)(3)(iii) and 42 CFR §423.505(i)(3)(iii)).

(f)     **Billing Rights.** DxID agrees that in no event, including, but not limited to, non-payment by Client, insolvency of Client or other financial difficulties of Client, shall DxID bill, charge, collect a deposit from, seek compensation, remuneration or reimbursement from or have any recourse against an Client member or person (other than Client) acting on his/her behalf, for services provided pursuant to this Agreement. Client agrees to indemnify any member of Client for payment of any fees that are the legal obligation of Client. The parties acknowledge that the payments made hereunder are funded in whole or in part from federal funds thereby subjecting the parties to certain laws applicable to individuals and entities receiving federal funds. This provision shall survive termination or expiration of this Agreement for any reason. (42 CFR §422.504(g)(1), 42 CFR §422.504(i)(3)(i) and 42 CFR §423.505(i)(3)(i)).

(g)     **Other CMS Matters**. Client shall oversee and is accountable to CMS for any functions or responsibilities that are described in 42 CFR §422.504(i)(3). Client agrees to include in this Agreement such other terms and conditions as CMS may find necessary and appropriate in order to implement the Medicare Advantage or Medicare part D programs. (42 CFR §422.504(j) and 42 CFR §423.505(j)).

(h)     **Certification**. DxID agrees and hereby certifies that it will review the United States General Services Administration and the United States Department of Health and Human Services' exclusion lists upon the initial hiring of any of its employees, agents or contracts who will be providing services under this Agreement and annually thereafter to ensure that any employee, agent or contractor who provides services hereunder is not excluded from participation any Federally-Funded health care programs. DxID further agrees that if it discovers any employee, agent or contractor has been excluded from participation in any health care program, such employee, agent or contractor will be immediately removed from providing services under this Agreement and DxID will take appropriate corrective actions. (42 CFR §1320 a-7).

15