# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA, ex rel.,
TERESA ROSS,

        Plaintiff,

        v.

INDEPENDENT HEALTH
ASSOCIATION, et al.,

        Defendants.

Civil Action No. 12-CV-0299 (WMS)

## MEMORANDUM OF LAW IN SUPPORT OF MOTION BY DEFENDANTS INDEPENDENT HEALTH CORPORATION, INDEPENDENT HEALTH ASSOCIATION, DXID, LLC, AND BETSY GAFFNEY TO DISMISS UNITED STATES' COMPLAINT IN INTERVENTION

Vincent E. Doyle III
Bryan P. Kroetsch
CONNORS LLP
1000 Liberty Building
Buffalo, NY 14202
Tel:  (716) 852-5533
Fax: (716) 852-5649
*Attorneys for Defendants*
*Independent Health Corporation;*
*Independent Health Association; and*
*DxID, LLC*

Daniel Meron (admitted *pro hac vice*)
David C. Tolley (admitted *pro hac vice*)
Michael Clemente (*pro hac vice* pending)
LATHAM & WATKINS LLP
555 Eleventh Street NW Suite 1000
Washington, DC 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
*Attorneys for Defendants*
*Independent Health Corporation;*
*Independent Health Association; and*
*DxID, LLC*

Timothy W. Hoover
Spencer L. Durland
HOOVER & DURLAND LLP
561 Franklin Street
Buffalo, New York 14202
Tel: (716) 800-2604
Fax: (716) 885-8569
*Attorneys for Defendant Betsy Gaffney*

## <u>TABLE OF CONTENTS</u>

**Page**

I.     INTRODUCTION ................................................................................................1

II.    BACKGROUND ................................................................................................3

    A. The Medicare Advantage Program ...........................................................3

    B. The Official ICD Guidelines And Informal Guidance Documents...............6

    C. Procedural History.....................................................................................9

III.   STANDARD OF REVIEW ..............................................................................11

IV.   ARGUMENT ..................................................................................................12

    A.  The Government Fails To Allege That Defendants Violated Any Legal
        Obligation .................................................................................................13

    B. Even If The Informal Coding Guidance Gave Rise To Legal Obligations,
       Defendants' Coding And Addenda Policies Were Consistent With That
       Guidance ..................................................................................................17

        1. Defendants' Coding Policies Were Consistent With Informal Guidance..........17

        2. Defendants' Addenda Process Did Not Violate Any Applicable
           Guidance ...........................................................................................32

    C.  Defendants' Conduct Was Consistent With An Objectively Reasonable
        Interpretation of the Applicable Requirements.......................................38

    D. The Complaint Fails Adequately To Plead That IH *Knew* DxID's Coding And
       Addenda Policies Were Unlawful.............................................................39

    E.  The Remaining Counts Are Equally Defective .........................................43

V.    CONCLUSION................................................................................................45

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*U.S. ex rel. Adams v. Remain at Home Senior Care*,
2021 WL 4398584 (D.S.C. Sept. 27, 2021)..................................................................43

*Albrecht v. Comm. on Emp. Benefits of Fed. Rsrv. Emp. Benefits Sys.*,
357 F.3d 62 (D.C. Cir. 2004) ......................................................................................44

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)................................................................................................11, 28

*Azar v. Allina Health Servs.*,
139 S. Ct. 1804 (2019)................................................................................2, 13, 14, 16

*Bellin v. Zucker*,
6 F.4th 463 (2d Cir. 2021) ..........................................................................................12

*U.S. ex rel. Colucci v. Beth Israel Med. Ctr.*,
785 F. Supp. 2d 303 (S.D.N.Y. 2011).........................................................................38

*U.S. ex rel. Complin v. N. Carolina Baptist Hosp.*,
818 F. App'x 179 (4th Cir. 2020) .................................................................................1

*Corsi v. Eagle Publ'g, Inc.*,
2008 WL 239581 (D.D.C. Jan. 30, 2008)....................................................................43

*Coyne v. Amgen, Inc.*,
717 F. App'x 26 (2d Cir. 2017) ...................................................................................12

*U.S. ex rel. Donegan v. Anesthesia Assocs. of Kan. City*,
833 F.3d 874 (8th Cir. 2016) .......................................................................................38

*U.S. ex rel. Farmer v. Houston*,
523 F.3d 333 (5th Cir. 2008) .......................................................................................43

*First Cap. Asset Mgmt. v. Satinwood, Inc.*,
385 F.3d 159 (2d Cir. 2004).........................................................................................12

*Fogel v. Vega*,
759 F. App'x 18 (2d Cir. 2018) ...................................................................................40

*Frith v. Hill*,
2009 WL 3073716 (S.D.N.Y. Sept. 23, 2009)...............................................................8

*In re Frito-Lay N. Am., Inc. All Nat. Litig.*,
    2013 WL 4647512 (E.D.N.Y. Aug. 29, 2013)........................................................8

*Gleave v. Graham*,
    954 F. Supp. 599 (W.D.N.Y. 1997), *aff'd* 152 F.3d 918 (2d Cir. 1998) ...................8

*Grandon v. Merrill Lynch & Co.*,
    147 F.3d 184 (2d Cir. 1998)........................................................................39

*U.S. ex rel. Grubbs v. Kanneganti*,
    565 F.3d 180 (5th Cir. 2009) ......................................................................43

*U.S. ex rel. Grubea v. Rosicki, Rosicki & Assocs., P.C.*,
    318 F. Supp. 3d 680 (S.D.N.Y. 2018)..................................................12, 39

*U.S. ex rel. Grupp v. DHL Exp. (USA), Inc.*,
    47 F. Supp. 3d 171 (W.D.N.Y. 2014),
    *aff'd* 604 F. App'x 40 (2d Cir. 2015)........................................................38

*U.S. ex rel. Hagood v. Sonoma Cnty. Water Agency*,
    81 F.3d 1465 (9th Cir. 1996) ................................................................38, 42

*U.S. ex rel. Haight v. RRSA (Com. Div.)*,
    2020 WL 6163139 (N.D. Tex. Oct. 20, 2020) ........................................43

*U.S. ex rel. Hixson v. Health Mgmt. Sys.*,
    613 F.3d 1186 (8th Cir. 2010) ................................................................38

*U.S. ex rel. Hockett v. Columbia/HCA Healthcare Corp.*,
    498 F. Supp. 2d 25 (D.D.C. 2007) .........................................................39

*Kisor v. Wilkie*,
    139 S. Ct. 2400 (2019)............................................................................13

*U.S. ex rel. Ladas v. Exelis, Inc.*,
    824 F.3d 16 (2d Cir. 2016)......................................................................12

*Lee v. Canada Goose US, Inc.*,
    2021 WL 2665955 (S.D.N.Y. June 29, 2021) ........................................44

*U.S. ex rel. Morsell v. Symantec Corp.*,
    471 F. Supp. 3d 257 (D.D.C. 2020) .......................................................44

*O'Brien v. Nat'l Prop. Analysts Partners*,
    936 F.2d 674 (2d Cir. 1991)...................................................................39

*Patane v. Clark*,
    508 F.3d 106 (2d Cir. 2007)...................................................................11

*Pencheng Si v. Laogai Rsch. Found.*,
    71 F. Supp. 3d 73 (D.D.C. 2014) ............................................................43

*Perez v. Mortg. Bankers Ass'n*,
    575 U.S. 92 (2015) ...........................................................................2, 13

*U.S. ex rel. Purcell v. MWI Corp.*,
    807 F.3d 281 (D.C. Cir. 2015) .......................................................2, 31, 37

*U.S. ex rel. Rasmussen v. Essence Grp. Holdings Corp.*,
    2020 WL 4381771 (W.D. Mo. Apr. 29, 2020) ........................................21, 22

*U.S. ex rel. Reeves v. Mercer Transp.*,
    253 F. Supp. 3d 1242 (M.D. Ga. 2017) ......................................................44

*Richardson v. N.Y.C. Bd. of Educ.*,
    711 F. App'x 11 (2d Cir. 2017) ................................................................8

*Roth v. Jennings*,
    489 F.3d 499 (2d Cir. 2007) ...................................................................29

*Safeco Ins. Co. of Am. v. Burr*,
    551 U.S. 47 (2007) ..............................................................................38

*U.S. ex rel. Schaengold v. Mem'l Health, Inc.*,
    2014 WL 6908856 (S.D. Ga. Dec. 8, 2014) ...............................................39

*Shields v. Citytrust Bancorp, Inc.*,
    25 F.3d 1124 (2d Cir. 1994) ...................................................................12

*Shimon v. Equifax Info. Servs.*,
    994 F.3d 88 (2d Cir. 2021) .....................................................................37

*U.S. ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.*,
    214 F.3d 1372 (D.C. Cir. 2000) ...............................................................38

*Staehr v. Hartford Fin. Servs. Grp.*,
    547 F.3d 406 (2d Cir. 2008) .....................................................................8

*U.S. ex rel. Tessler v. City of New York*,
    712 F. App'x. 27 (2d Cir. 2017) ...............................................................39

*U.S. v. Aegis Therapies, Inc.*,
    2015 WL 1541491 (S.D. Ga. Mar. 31, 2015) .............................................45

*U.S. v. Allergan Inc.*,
    746 F. App'x 101 (3d Cir. 2018) .........................................................2, 38

*U.S. v. First Choice Armor & Equip.*,
    808 F. Supp. 2d 68 (D.D.C. 2011) ....................................................44, 45

*U.S. v. Kellogg Brown & Root Servs.*,
    800 F. Supp. 2d 143 (D.D.C. 2011) ........................................................44

*U.S. v. Sci. Applications Int'l Corp.*,
    555 F. Supp. 2d 40 (D.D.C. 2008) ..........................................................45

*U.S. v. Strock*,
    2019 WL 4640687 (W.D.N.Y. Sept. 24, 2019) ......................................39

*Wexner v. First Manhattan Co.*,
    902 F.2d 169 (2d Cir. 1990).....................................................................40

*U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*,
    525 F.3d 370 (4th Cir. 2008) ...................................................................38

*Zucco v. Auto Zone, Inc.*,
    800 F. Supp. 2d 473 (W.D.N.Y. 2011) ...................................................11

## STATUTES

31 U.S.C.
    § 3729(a) ..................................................................................................12
    § 3729(a)(1)(C) ..................................................................................42, 43
    § 3729(b)(1)(B) ........................................................................................43
    § 3729(b)(3) ........................................................................................13, 38

42 U.S.C.
    §§ 1395c-1395i-6 ......................................................................................3
    § 1395hh(a)(2) .........................................................................................14
    §§ 1395j-1395w-6 .....................................................................................3
    §§ 1395w-21-1395w-28 ............................................................................3
    § 1395w-23 ................................................................................................4

## RULES

Fed. R. Civ. P.
    9(b)..........................................................................................3, 12, 39, 40
    12(b)(6) ....................................................................................................11

Fed. R. Evid.
    201(b)(2) ....................................................................................................8
    902(5)..........................................................................................................8

# REGULATIONS

42 C.F.R.
    § 422.310(d) ...........................................................................................................17
    § 422.310(d)(1) ......................................................................................................17
    § 422.503(b)(4)(iv) ...............................................................................................16
    § 422.504 ...............................................................................................................16

45 C.F.R.
    § 162.1002(a)(1)-(2) ...............................................................................................4
    § 162.1002(a)(1)-(2), (b)(1) ....................................................................................6
    § 162.1002(b)(1) .....................................................................................................5

70 Fed. Reg. 4588-01 (Jan. 28, 2005) .............................................................................17

# OTHER AUTHORITIES

2011 ICD-9-CM Guidelines, CDC,
    https://www.cdc.gov/nchs/data/icd/icd9cm_guidelines_2011.pdf ............................6

2014 ICD-10-CM Guidelines, CDC, https://www.cdc.gov/nchs
    /data/icd/icd10cm_guidelines_2014.pdf ...................................................................6

CMS, 1997 DOCUMENTATION GUIDELINES FOR EVALUATION AND MANAGEMENT
    SERVICES (1997) .......................................................................................................30

CMS, *Announcement of Calendar Year (CY) 2014 [MA] Capitation Rates and [MA] and
    Part D Payment Policies and Final Call Letter* at *32* (Apr. 1, 2013),
    https://www.cms.gov/Medicare/Health-
    Plans/MedicareAdvtgSpecRateStats/Downloads/Announcement2014.pdf............................31

*Exciting news about 2022 Medicare Star Ratings*, INDEP. HEALTH (Oct. 13, 2021),
    https://www.independenthealth.com/about/newsroom/2021/exciting-news-about-
    2022-medicare-star-ratings ......................................................................................10

HHS Guidance Submissions, HHS, www.hhs.gov/guidance/ (last visited Nov. 12, 2021) ........36

*ICD-9-CM Official Guidelines for Coding and Reporting 9*, HEALTHCARE FIN. ADMIN.
    (1991),
    https://babel.hathitrust.org/cgi/pt?id=mdp.39015021990034&view=1up&seq=1 ...................7

Margaret Baumgarten & Todd Gehr, *Chronic Kidney Disease: Detection and Evaluation*,
    84 AM. FAM. PHYSICIAN 10 (Nov. 15, 2011),
    https://www.aafp.org/afp/2011/1115/p1138.html...................................................29

*Medicare Managed Care Manual*, *Chapter 7- Risk Adjustment*, CMS (2014) ..........................7

*Risk Adjustment Training for Medicare Advantage Organizations Participant Guide*, CMS (2008), https://www.csscoperations.com/Internet/Cssc3.Nsf/files/participant-guide-publish_052909.pdf/$File/participant-guide-publish_052909.pdf ........................7, 8, 18

U.S. DEP'T OF J., MEMORANDUM ON *ISSUANCE AND USE OF GUIDANCE DOCUMENTS BY THE DEPARTMENT OF JUSTICE* at 2 (July 1, 2021), https://www.justice.gov/opa/page/file/1408606/download .....................................................13

*What is the Criteria for CKD*, NAT'L KIDNEY FOUND., https://www.kidney.org/professionals/explore-your-knowledge/what-is-the-criteria-for-ckd.....................................................................................................................................29

## I.    INTRODUCTION

This False Claims Act (FCA) lawsuit attempts to manufacture a fraud case out of compliance with an intentionally open-ended regulatory framework.  There are longstanding ambiguities in the diagnostic coding criteria for reimbursement in the Medicare Advantage (MA) program—specifically, what type and degree of documentation in medical charts is sufficient to support a diagnosis code for reimbursement.  Those coding ambiguities are not new.  They result from a decision by the Centers for Medicare and Medicaid (CMS) to refrain from promulgating detailed, legally binding coding rules and instead mandate only *one* relevant rule:  MA plans must follow the coding criteria in the International Classification of Diseases Guidelines for Coding and Reporting (ICD Guidelines).  The ICD Guidelines that the government invokes here, however, provide only general, high-level coding guidance and address *none* of the specific coding practices at issue.  Instead of promulgating nuanced coding rules, CMS designed the MA system to rely on the judgment of professional coders, who themselves rely on an assortment of nonbinding and often vague and conflicting guidance from public and private entities.  The government's Complaint-in-Intervention (Complaint) seeks to exploit that open-ended framework by pressing a novel and unfounded interpretation of the ICD Guidelines and by attempting to enforce *nonbinding* guidance about specific coding issues.  Worse yet, the government is simply wrong about the ICD Guidelines and the nonbinding guidance, both of which fully support Defendants' policies.

At best for the government, the Complaint alleges Defendants' good-faith attempt to navigate an ambiguous regulatory framework.  That is not enough to sustain a claim under the FCA, which penalizes out-and-out fraud—not good faith disagreements over objectively ambiguous coding criteria.  *See U.S. ex rel. Complin v. N. Carolina Baptist Hosp.*, 818 F. App'x 179, 184 (4th Cir. 2020) ("[T]he FCA does not reach an innocent, good-faith mistake about the

meaning of an applicable rule or regulation." (quoting *U.S. ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 287-88 (D.C. Cir. 2015))).  Defendants accurately applied the ICD Guidelines *and* informal coding guidance, but even if there were room to quibble, that would still be insufficient because the FCA does not penalize "reasonable but erroneous interpretations of a defendant's legal obligations."  *U.S. v. Allergan Inc.*, 746 F. App'x 101, 106 (3d Cir. 2018) (quoting *Purcell*, 807 F.3d at 287-88).  The Complaint thus fails as a matter of law on several independent bases.

*First*, the government cannot identify any enforceable legal obligation that Defendants purportedly violated.  The Complaint's coding-policy allegations repeatedly invoke the ICD Guidelines, Compl. ¶¶ 184-244; 288-338, but those Guidelines set forth none of the specific coding "rules" the government seeks to enforce.  The addenda allegations, in turn, rely exclusively on informal guidance documents, most of which are published by private entities, *id.* ¶¶ 339-412, but it is blackletter law that guidance documents cannot create legal obligations and thus cannot provide the basis for an FCA enforcement action.  *See Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1813-14 (2019); *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015).

*Second*, the government's novel interpretation of the ICD Guidelines and nonbinding coding guidance could not be more wrong on the merits.  For the coding-policy allegations, the Complaint latches on to a single sentence from the ICD Guidelines, misreads the plain text of that sentence, and ignores CMS's own guidance interpreting it, which affirmatively *rejects* the Complaint's reading.  For the addenda allegations, the Complaint does not even attempt to cite any binding rule establishing the government's novel standards for "impermissibly leading" and "untimely" addenda—in fact, the Complaint itself is unable to articulate these standards.  The Complaint is wrong on the law, but at minimum, Defendants' interpretation of the guidance was "objectively reasonable," which itself precludes FCA liability.  *Purcell*, 807 F.3d at 288.

*Third*, the Complaint fails to plead with the particularity required by Rule 9(b) that Defendants IHC and IHA knew or recklessly disregarded that DxID's coding policies were allegedly improper. Instead of well-pled scienter allegations, the Complaint resorts to a campaign of guilt by association, a tactic that courts roundly reject. This Court should do the same.

*Finally*, the remaining conspiracy and common-law claims are equally meritless. Because of the corporate and employment relationship between Defendants, the government's theory of conspiracy is categorically foreclosed by the intra-corporate conspiracy doctrine. The Complaint also fails to adequately allege the specific intent required for FCA conspiracy.

As the Court well knows, this case has taken almost a decade to get to this stage. The government spent over seven years investigating before notifying the Court that it intended *not* to intervene, only to change course months later. By the time it drafted its Complaint, the government had the benefit of reviewing Defendants' fully briefed motion to dismiss the relator's complaint, which raised many of the same arguments, and yet the government has still been unable to craft a complaint that avoids the same fundamental flaws. Now that the government's Complaint is finally before the Court, the Court should resolve this matter once and for all and dismiss the Complaint with prejudice.

## II.    BACKGROUND

### A. The Medicare Advantage Program

CMS is responsible for administering the Medicare Program. Under Parts A and B of the Medicare Program, known as "traditional" Medicare, CMS directly reimburses healthcare providers (e.g., physicians) using a fee-for-service (FFS) payment model. *See* 42 U.S.C. §§ 1395c-1395i-6 (Part A, covering inpatient care); *id.* §§ 1395j-1395w-6 (Part B, covering outpatient care). In 1997, Congress created Medicare Part C, now called the MA program, as an alternative to traditional Medicare. *Id.* §§ 1395w-21-1395w-28. The MA program uses an insurance payment

model instead of the FFS model used in traditional Medicare. CMS pays private insurance plans—MA plans—to take on the risk of covering Medicare beneficiaries. When a beneficiary enrolls in an MA plan, CMS pays the plan a fixed monthly amount in exchange for the plan covering all of the beneficiary's qualified healthcare costs, whatever those end up being. *See generally id.* § 1395w-23. The MA program thus incentivizes MA plans to manage beneficiaries' care in a way that promotes long-term health and offers better services, while also allowing CMS to offload risk.

MA plans assume different degrees of risk when insuring beneficiaries who are healthier or sicker than average. To account for that, CMS's payments include a "risk adjustment" that is keyed to beneficiaries' expected healthcare costs. Compl. ¶¶ 64-65. Those expected costs are calculated based on the presence of certain demographic characteristics and health conditions that are known to increase health risks. For example, a 65-year-old beneficiary with no chronic health conditions would not be expected to incur significant health costs in a year, so an MA plan would receive lower than average payments for insuring that individual. By contrast, a 93-year-old beneficiary with diabetes and multiple sclerosis is likely to require significant interventions, so an MA plan would receive higher payments for such a beneficiary. These risk-adjustment payments are prospective, and thus not tied to the services a beneficiary actually used in a particular year.

A beneficiary's health conditions are determined by diagnosis codes, which are alphanumerical codes that represent a patient's diagnosed conditions. CMS requires MA plans to submit annually all diagnosis codes applicable to each beneficiary. The set of alphanumeric codes used to report these conditions is the International Classification of Diseases (ICD), a classification system that contains tens of thousands of codes, each corresponding to a different condition or health status. Health and Human Services (HHS) adopted the Ninth Edition of the ICD up until 2015 (ICD-9), after which it adopted the Tenth Edition (ICD-10). 45 C.F.R. § 162.1002(a)(1)-(2);

*id.* § 162.1002(b)(1).  CMS and MA plans use the diagnosis codes from the prior year to set the payment amounts that plans will receive for the future risk they take on by insuring beneficiaries in the subsequent year.

Both traditional Medicare and the MA program use the ICD diagnosis codes, but because of their respective reimbursement schemes, they do so for quite different purposes.  In traditional Medicare, CMS reimburses physicians for the services they provided to patients in particular office visits or "encounters."  FFS is fundamentally backward-looking, compensating providers after the fact for services rendered.  In that context, diagnosis codes can justify the level of service or treatment provided.  For example, a certain diagnosis code may justify why an encounter was more complex or time intensive, thus yielding a higher reimbursement amount, e.g., a higher level of office visit.  In this setting, the question is whether the diagnosis actually caused physicians to provide the costlier service for which they are being reimbursed.  If the diagnosis did not impact the services during the visit, the physician may not be entitled to any additional reimbursement.

In the MA program, by contrast, diagnosis codes are used to establish beneficiaries' medical risk profile for risk-adjustment purposes.  Risk adjustment is fundamentally forward-looking, compensating MA plans for assuming the risk of insuring beneficiaries for future healthcare expenses.  Here, the relevant question is not whether a provider rendered particular services to a beneficiary during a past visit, but whether a beneficiary has certain conditions that are predictors of future health costs.  If the beneficiary in fact has a such a predictive condition, the insurer will be exposed to that increased risk and cost, regardless of the particular treatments the physician documented the prior year.[1]

---

[1] Because physicians in traditional Medicare are ultimately paid for *services* instead of *diagnoses*, they generally have little incentive to code diagnoses beyond what is necessary to justify their procedures.  *See* AAPC, *Risk Adjustment—Predictive Modeling, Documentation, & Capture of*

**B. The Official ICD Guidelines And Informal Guidance Documents**

CMS has promulgated virtually no rules governing the coding criteria in the MA program—specifically, the degree and kind of documentation necessary in a medical chart to support a diagnosis code for risk-adjustment purposes. CMS's *only* regulation specifically addressing coding criteria simply requires coders to follow the Official ICD-9/10 Guidelines for Coding and Reporting (ICD Guidelines), which HHS has formally adopted alongside the ICD classification system. *See* 45 C.F.R. § 162.1002(a)(1)-(2), (b)(1). These guidelines are the "[o]nly . . . set of guidelines" that are "official." 2014 ICD-10-CM Guidelines at 1, CDC, https://www.cdc.gov/nchs/data/icd/icd10cm_guidelines_2014.pdf (ICD-10).

Although the ICD Guidelines have been adopted by CMS through regulation and have the force of law, they address virtually none of the myriad intricate coding questions that regularly arise for MA plans when assessing whether the documentation in a medical chart supports a diagnosis code. Instead, the ICD Guidelines largely provide granular explanations of particular codes. As relevant here, the ICD Guidelines contain three sentences addressing coding criteria:

> Code all documented conditions that coexist at the time of the encounter/visit, and require or affect patient care treatment or management. Do not code conditions that were previously treated and no longer exist. However, history codes (categories Z80-Z87) may be used as secondary codes if the historical condition or family history has an impact on current care or influences treatment.

ICD-10 at 104; 2011 ICD-9-CM at 95, CDC, https://www.cdc.gov/nchs/data/icd/icd9cm_guidelines_2011.pdf (ICD-9) (same). Notably, this language was originally introduced in the ICD Guidelines to address coding in the FFS context,

---

*Diagnosis Code* (2014), Ex. A at 19-20. Due to this asymmetry in the role and importance of diagnosis codes in the FFS and risk-adjustment models, all MA plans engage in chart reviews to ensure that they have complete diagnostic profiles of their beneficiaries and are being properly compensated for the level of risk they incur. That is a standard industry practice, and the government does not (and could not) allege that the practice of chart review is itself improper.

before the MA program (or risk adjustment) was created.  *See ICD-9-CM Official Guidelines for Coding and Reporting 9*, HEALTHCARE FIN. ADMIN. (1991), https://babel.hathitrust.org/cgi/pt?id=mdp.39015021990034&view=1up&seq=1 (containing materially identical language).

Because CMS has promulgated only one binding rule governing coding, it relies instead on trained coders to use their expertise and "professional judgment" to code conditions based on different documentation formats and standards used by providers.  *2017 Benefit Year Protocols PPACA HHS Risk Adjustment Data Validation*, CMS (Aug. 10, 2018), Ex. B at 78 (listing CMS Protocols).  In using their judgment, coders consult a diverse array of murky and often conflicting informal guidance documents.  *See* Compl. ¶¶ 78-80; Ex. A at 19-25 (discussing several longstanding areas of confusion and disagreement in coding practices).  Much of that guidance is created by private organizations such as the American Health Information Management Association (AHIMA), the American Hospital Association (AHA) Coding Clinic, and the American Academy of Professional Coders (AAPC), the entity which certifies diagnostic coders. In addition to those private entities, CMS also provides nonbinding coding guidance in various forms.  *See, e.g.*, *Risk Adjustment Training for Medicare Advantage Organizations Participant Guide*, CMS (2008), https://www.csscoperations.com/Internet/Cssc3.Nsf/files/participant-guide-publish_052909.pdf/$File/participant-guide-publish_052909.pdf (Participant Training Guide); *Medicare Managed Care Manual*, *Chapter 7– Risk Adjustment*, CMS (2014).

Although CMS encourages providers and MA plans to consult this array of informal guidance, *see* Participant Training Guide at 6-13, it emphasizes that the ICD Guidelines are the only "official," authoritative guidance.  *See* ICD-10 at 1 ("Only this set of guidelines, approved by [CMS, NCHS, the AHA, and AHIMA], is official."); ICD-9 at 1 (same).  CMS's training manuals

likewise make clear that they are not comprehensive resources and do not impose special coding rules specific to MA plans.[2]  To the contrary, the Participant Training Guide states (at 6-5) that the MA program follows the "Standard ICD-9-CM coding practices," and thus urges MA plans to consult coding resources disseminated by the various private bodies listed at the end of the training presentation, which include the AHA Coding Clinic and the AAPC.  *Id.* at 6-4.

CMS has also issued internal guidance for its coders.  In the MA program, CMS provides manuals for its coders to use when conducting Risk Adjustment Data Validation (RADV) audits of MA plans.  *See* CMS, 2011 RADV Guide, Ex. C; CMS, 2012 RADV Guide, Ex. D.[3]  It also provides coding guidance for individual commercial plans and their independent data validation (IVA) entities to use under the Affordable Care Act (PPACA).[4]  Ex. B.  These manuals and

---

[2] *See* Participant Training Guide at 6-1 ("It is neither the intention of this [risk-adjustment] module nor the purpose of this training [manual] to provide diagnostic coding training."); *id.* at 6-13 (directing readers seeing coding training to consult one of several other resources, including private coding guidance and "local community and 4-year college[] courses"); Ex. B at 72-73.

[3] This Court may consider documents subject to judicial notice at the motion-to-dismiss stage without converting the motion into one for summary judgment.  *Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 425-26 (2d Cir. 2008).  Agency documents, such as the RADV Guides, are judicially noticeable so long as the document's authenticity is "not subject to reasonable dispute because [it] . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  *Richardson v. N.Y.C. Bd. of Educ.*, 711 F. App'x 11, 13 (2d Cir. 2017) (quoting FED. R. EVID. 201(b)(2)); *see also* FED. R. EVID. 902(5) (a "book, pamphlet, or other publication purporting to be issued by a public authority" is self-authenticating).  Accordingly, courts routinely take judicial notice of agency guidance documents—particularly where, as here, those documents are offered for the legal significance of the guidance they provide, rather than for proof of an extrinsic or historical fact contained therein.  *See, e.g.*, *Gleave v. Graham*, 954 F. Supp. 599, 605-606 (W.D.N.Y. 1997) (taking judicial notice of internal Bureau of Prisons "Program Statements"), *aff'd* 152 F.3d 918 (2d Cir. 1998); *In re Frito-Lay N. Am., Inc. All Nat. Litig.*, 2013 WL 4647512, at *3-4 (E.D.N.Y. Aug. 29, 2013) (taking judicial notice of various "policy and guidance documents" issued by federal agencies); *Frith v. Hill*, 2009 WL 3073716, at *16-17, 16 n.10 (S.D.N.Y. Sept. 23, 2009) (taking judicial notice of "internal ATF guidelines submitted by [defendant]" in granting motion to dismiss).

[4] Payments to both MA plans and individual commercial plans under PPACA are risk adjusted by CMS based on beneficiaries' diagnosis codes.  Unlike MA, where CMS coders audit a selection of MA plans for each calendar year, under PPACA each plan hires an IVA company to audit a

protocols are designed to outline general coding principles for auditors to use in assessing whether the diagnosis codes submitted by a plan to CMS as part of its risk-adjustment data are adequately documented per the ICD Guidelines.  These documents thus reflect CMS's own interpretation of the ICD Guidelines as they apply in the risk-adjustment context.

### C. Procedural History

Relator Teresa Ross initiated this lawsuit under seal in April 2012.  *See* ECF No. 1.  Ross was formerly the Director of Risk Adjustment Services for Group Health Cooperative (GHC), a Seattle-based insurance company that operated MA plans in Washington and Idaho, and was subsequently acquired by another entity.  Compl. ¶¶ 5, 14 & n.4, 24, 48, 126 & n.14.  Ross's allegations centered on a series of disagreements she had with GHC and an external risk consultant, Defendant DxID, over how to interpret the informal coding guidance published by CMS and various private entities.  DxID is a New York limited liability company that formerly provided chart review services to MA plans, though it is no longer operational.  *Id.* ¶ 27.

Ross also brought claims against Independent Health Association (IHA) and Independent Health Corporation (IHC) (collectively, IH).  IHA is a nonprofit company that operates an MA plan in western New York.  *Id.* ¶ 25.  IHC is a for-profit, wholly owned subsidiary of IHA, and the parent company of DxID.  *Id.* ¶¶ 26, 27.  IH provides one of the top performing MA plans in the country, and is one of only seven plans with multiple MA contracts to have all of their contracts receive 5 Stars from CMS—the highest rating.  The Star Ratings are designed to assess the quality,

---

sample of its codes annually and report the results to CMS.  Ex. B at 10.  CMS publishes RADV protocols under PPACA to guide plans and IVAs in diagnosis coding for risk-adjustment purposes.

value, and performance of MA plans nationwide.[5]  Like GHC, IH relied on DxID for its coding expertise.  Other than their retention of DxID, there is no affiliation between IH and GHC.

Finally, Ross also named as a defendant Betsy Gaffney, DxID's co-CEO.  While DxID employed expert certified coders, Gaffney herself is not a certified coder.  Another defendant, Dr. John Haughton, was voluntarily dismissed.  *See* ECF. Nos. 145-46.

The government received Ross's initial complaint in 2012, investigated the matter for over seven years, and then filed a notice indicating that it was electing not to intervene at that time. ECF No. 62.  Ross then served an amended complaint and the parties fully briefed a motion to dismiss, only after which point the government filed a motion to intervene.  ECF Nos. 105 (Motion to Intervene) & 138 (Order Granting Motion), and subsequently filed its Complaint in Intervention.

The government's Complaint alleges that Defendants fraudulently submitted diagnosis codes to CMS that were supported by insufficient documentation in their medical charts.  The Complaint presses two fraud theories: "(1) a retrospective chart review program and (2) an addenda process."  Compl. ¶¶ 11, 134.  The Complaint's allegations regarding Defendants' chart review program focus on coding policies it alleges DxID employed in reviewing medical charts. Specifically, the Complaint alleges that DxID's coders relied on certain parts of medical charts— such as problem lists and past medical history—as support for diagnosis codes, and that DxID coded various chronic conditions that physicians had documented in the charts regardless of whether the physicians had documented that they had treated the conditions during the encounter or that the conditions were otherwise "relevant to" care during the encounter.  *Id.* ¶¶ 184-244; 288- 338.  The government contends that using those portions of medical charts to support diagnosis

---

[5]    *Exciting news about 2022 Medicare Star Ratings*, Indep. Health (Oct. 13, 2021), https://www.independenthealth.com/about/newsroom/2021/exciting-news-about-2022-medicare-star-ratings.

codes is prohibited by a single sentence of the ICD Guidelines, which instructs coders to "Code all documented conditions that coexist at the time of the encounter/visit, and require or affect patient care treatment or management." ICD-10 at 104. Under the government's view, that sentence permits coding a medical condition only when the physician not only documented the existence of the condition, but also went further and expressly documented that the condition was treated during the encounter or was otherwise "relevant to" or affected care during the encounter.

As for the addenda-related fraud theory, the Complaint alleges that Defendants knowingly used an addenda process that was "impermissibly leading" and untimely. Compl. ¶¶ 339-412. The government does not—and cannot—claim that Defendants' addenda practice violates the ICD Guidelines, which in no way address addenda, but rather that it violates various informal guidance issued by CMS and private entities. *Id.* ¶¶ 342-43 & nn.26-29. While the government acknowledges that using addenda is a "legitimate" practice under "CMS rules and guidance, as well as industry practice," *id.* ¶ 342, it claims that Defendants' addenda were too "leading" because they were "not merely asking but rather asserting as facts that the identified conditions existed," *id.* ¶ 368. It also claims that Defendants committed fraud by submitting "untimely" addenda requests to physicians "months after the patient encounter." *Id.* ¶ 402.

Based on the same underlying factual allegations, the Complaint also brings claims for conspiracy to violate the FCA, *id.* ¶¶ 429-32, and common-law claims of payment by mistake and unjust enrichment, *id.* ¶¶ 433-38.

## III.    STANDARD OF REVIEW

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the party's claim for relief." *Zucco v. Auto Zone, Inc.*, 800 F. Supp. 2d 473, 475 (W.D.N.Y. 2011) (citing *Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007)). While the court

must accept well-pleaded facts as true, "this presumption of truth does not extend to legal conclusions." *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)). "[S]ources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss" include "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Bellin v. Zucker*, 6 F.4th 463, 472-73 (2d Cir. 2021) (internal quotation marks omitted).

In addition, Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *see also U.S. ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 26 (2d Cir. 2016) (explaining that Rule 9(b)'s requirements must be "rigorously enforce[d]" in FCA cases (citation omitted)). In the FCA context, Rule 9(b) requires specific factual allegations creating a strong inference of fraudulent intent. *See U.S. ex rel. Grubea v. Rosicki, Rosicki & Assocs., P.C.*, 318 F. Supp. 3d 680, 694 (S.D.N.Y. 2018) (citing *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994)); *First Cap. Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 178 (2d Cir. 2004) (collecting cases).

## IV.    ARGUMENT

To state a claim under the FCA, 31 U.S.C. § 3729(a), the government must show that "the defendants (1) made a claim, (2) to the United States Government, (3) that is false or fraudulent, (4) knowing of its falsity, and (5) seeking payment from the federal treasury." *Coyne v. Amgen, Inc.*, 717 F. App'x 26, 28 (2d Cir. 2017) (citation omitted).

Here, the Complaint's fraud allegations fail for multiple independent reasons. *First*, the government cannot identify any enforceable legal obligation that Defendants purportedly violated. *Second*, even if the informal guidance from CMS and private entities created enforceable legal obligations, that guidance fully supports Defendants' policies. At a minimum, Defendants' interpretation of that ambiguous guidance is objectively reasonable, thus precluding FCA liability.

*Third*, the government failed to plead with the particularity required by Rule 9(b) facts showing that Defendant IH *knew* that DxID's coding policies were allegedly improper. *Finally*, the tack-on conspiracy and common-law claims fail for all the same reasons (and more) as the FCA claim. These defects are fatal and the Complaint should be dismissed with prejudice.

### A.  The Government Fails To Allege That Defendants Violated Any Legal Obligation

FCA liability must be based on a false claim—that is, a claim that falsely purports to satisfy an enforceable legal obligation, such as a statute, regulation, or contract.  31 U.S.C. § 3729(b)(3). It is well-established that sub-regulatory guidance documents cannot establish such an obligation because they "do not have the force and effect of law."  *Perez*, 575 U.S. at 97 (citation omitted). As the Supreme Court recently reaffirmed, an agency guidance document "itself *never* forms the basis for an enforcement action" because such a document "does not impose *any legally binding requirements* on private parties."  *Kisor v. Wilkie*, 139 S. Ct. 2400, 2420 (2019) (emphases added) (citation and internal quotations omitted).  This principle is uncontroversial and expressly recognized by the Department of Justice.  *See* U.S. DEP'T OF J., MEMORANDUM ON *ISSUANCE AND USE OF GUIDANCE DOCUMENTS BY THE DEPARTMENT OF JUSTICE* at 2 (July 1, 2021), https://www.justice.gov/opa/page/file/1408606/download (stating that "an agency guidance document by itself never forms the basis for an enforcement action" and that "enforcement actions must be based on the failure to comply with a binding obligation, such as one imposed by the Constitution, a statute, a legislative rule, or a contract").

This general principle applies with even greater force in the Medicare program, which includes an express—and broad—statutory prohibition on CMS's use of sub-regulatory guidance to establish requirements related to payment.  The Medicare Act requires public notice and 60-day comment period for any "rule, requirement, or *other statement of policy* . . . that establishes or changes a substantive legal standard governing the scope of . . . payment for services . . . under

13

[Medicare]."  42 U.S.C. § 1395hh(a)(2) (emphasis added).  As the Supreme Court recently explained in *Azar v. Allina Health Servs.*, 139 S. Ct. 1804 (2019), that language is stricter than the notice-and-comment requirement in the Administrative Procedure Act (APA) and mandates notice and comment even for interpretive rules and statements of policy (which are exempted under the APA).  *Id.* at 1813-14.  Thus, any Medicare pronouncement that establishes or changes a "substantive legal standard" governing payment for services, whether deemed legislative, interpretive, or a statement of policy, *must* go through notice and comment to be legally binding.  *Id.*  CMS's informal guidance materials (much less those from private entities), which did not go through notice and comment, thus cannot establish an "obligation" under the FCA.

Here, the Complaint fails out of the gate because the government cannot identify any binding rules that establish the obligations it seeks to enforce.  The only binding rules it identifies are broad requirements that do not address, much less set forth, its purported coding rules.

*i. The ICD Guidelines.*  All of the government's coding-policy allegations rely exclusively on a single provision in the ICD Guidelines, Subsection IV, Paragraph J.  *See* ICD-10 at 104; ICD-9 at 95 (Paragraph K).  Although the ICD Guidelines have the force of law, they do not set forth any of the alleged "rules" on which the Complaint is based.  Paragraph J states in relevant part: "Code all documented conditions that coexist at the time of the encounter/visit, and require or affect patient care treatment or management."  ICD-10 at 104.  According to the government, this sentence requires not only documentation of the existence of a patient's conditions, but also documentation that the physician treated the condition during the encounter or that the condition otherwise affected care.  *See* Compl. ¶¶ 77, 154, 283-84, 305.  The sentence therefore establishes, according to the government, that certain types of documentation, such as problem lists and past medical history, are categorically insufficient to support coding a condition.  *Id.* ¶ 150.

The government badly misreads this sentence.  A plain reading of this ICD Guideline provision makes clear that it says *nothing* about the key issues in this case.  To begin, as a matter of grammar, the word "documented" modifies only the following word "condition."  The ICD Guidelines require the condition to be documented.  But that is where the documentation requirement ends.  The second half of the sentence—"and require or affect patient care treatment or management"—is left to the coder's judgment.  That is, coders must determine based on the medical record, including the type of condition, whether the documented condition likely "affect[ed] patient care treatment or management."  The sentence does not require documentation of physicians' mental processes.   The government's contrary reading, which insists on documentation of not only the existence of the *condition* but also how the condition *affected the encounter*, would require rewriting the sentence: "Code all ~~documented~~ conditions ~~that~~ **documented as** coexist**ing** at the time of the encounter/visit, and **documented** as require~~ing~~ or affect**ing** patient care treatment or management."

Nor does the second sentence of Paragraph J, which the Complaint quotes only once, Compl. ¶¶ 299-300, support the government's claim that the ICD Guidelines prohibit coding "*continuing* chronic conditions," *id.* ¶ 300 (emphasis added), documented in the past medical history "with no sign of treatment," *id.* ¶¶ 302-303.  That sentence states in full:  "Do not code conditions that were previously treated *and* no longer exist."  ICD-10 at 104 (emphasis added); ICD-9 at 95 (same).  It does not address, much less prohibit, coding conditions that were previously treated but *do* continue to exist.  Thus, the ICD Guidelines—which are the only coding criteria with the force of law—do not state that providers must document evidence of current treatment in order for existing chronic conditions to be coded.

Furthermore, while the ICD Guidelines require the condition to be "documented," it does not address in any way the *type* of documentation. Does a chronic condition mentioned in the problem list section of the chart qualify as documentation? What about the "patient history" or "past medical history" section? EKGs interpreted by a physician? A lab report? None of these issues are even *addressed* by this sentence in the ICD Guidelines, much less does this sentence set forth the requirements pressed by the government.

The Complaint's addenda theory stands on even weaker ground. The Complaint cannot (and does not) claim that the ICD Guidelines or any other rule or regulation addresses the content or timing of addenda. Instead, the government tries to invent enforceable rules from an assortment of public and private guidance, in some cases highly informal documents (such as a transcript of an industry call). *See* Compl. ¶ 343 n.29 (distilling rules from an assortment of guidance documents, including CMS's response to "Frequently asked questions"). *None* of these documents went through notice-and-comment rulemaking, and *none* of them can form the basis of an enforceable legal obligation. *See Allina*, 139 S. Ct. at 1813-14.

*ii. General Program Regulations.* The Complaint also cites several general regulations about coding accuracy, but none of them provide coding criteria. As with the ICD Guidelines, these regulations are binding but provide no support for the government's specific coding allegations. For example, the government repeatedly cites regulations that require MA plans to submit risk-adjustment data that is "accurate, complete, and truthful." *See* Compl. ¶¶ 7, 54, 59, 87 (citing 42 C.F.R. § 422.504). That general requirement, which Defendants wholly embrace, does not address the documentation-sufficiency question at issue here. The government also cites regulations that require MA plans to have compliance programs, *see id.* ¶¶ 52, 54 (citing 42 C.F.R. § 422.503(b)(4)(iv)), and regulations requiring diagnoses to be documented in medical charts, *see*

*id.* ¶¶ 73-80.  Again, at that level of generality, there is no dispute.  Finally, the government twice

references regulatory language requiring compliance with "all relevant national standards."  *Id.*

¶ 72 (citing 42 C.F.R. § 422.310(d)(1)); *id.* ¶ 145 (same).  That regulation merely addresses how

MA plans must format the data they submit.[6]  In sum, none of these regulations address the

purported legal obligations that the government seeks to enforce.

### B. Even If The Informal Coding Guidance Gave Rise To Legal Obligations, Defendants' Coding And Addenda Policies Were Consistent With That Guidance

The Complaint fails to identify a single legally binding rule that sets forth the coding

criteria on which the Complaint's coding-policy or addenda claims rest.  For that reason alone, the

Complaint should be dismissed.  But even if the informal coding guidance from CMS and private

entities were binding, Defendants' policies were fully consistent with those pronouncements.

#### 1. Defendants' Coding Policies Were Consistent With Informal Guidance

All of the Complaint's coding-policy allegations are premised on the theory that a condition

documented in a medical chart may not be coded for risk-adjustment purposes unless the physician

*also* documented how the condition affected care during the encounter.  Compl. ¶ 302 (condition

coded despite "no sign of treatment"); *id.* ¶ 293 (no documentation that the condition "was a factor

in the encounter"); *id.* ¶ 283 (condition must be documented as "relevant to patient care" during

---

[6]  This regulation subsection is titled "Other data requirements," 42 C.F.R. § 422.310(d), and it plainly addresses data formatting: "MA organizations must submit data that conform to CMS' requirements for data equivalent to Medicare fee-for-service data, when appropriate, and to all relevant national standards.  CMS may specify abbreviated formats for data submission required of MA organizations."  *Id.* § 422.310(d)(1).  The plain reading of the regulation is confirmed by its history.  That same language, with minor variations, was included in the 2005 rule replacing the prior M+C program with the MA program:  "MA organizations must submit data that conform to the requirements for equivalent data for Medicare fee-for-service when appropriate, and to all relevant national standards.  *Alternatively*, MA organizations may submit data according to an *abbreviated format*, as specified by CMS."  70 Fed. Reg. 4588-01, 4731 (Jan. 28, 2005) (emphasis added).  That earlier version, by using the word "alternatively," connects the two sentences and confirms that the first sentence addresses data formatting.

the encounter). Under the government's view, for instance, if the medical chart notes a patient's chronic condition of amputation, that condition would not be codable for risk-adjustment purposes unless the physician also documented how the amputation affected treatment during the visit. Not only is that approach contrary to the text of the ICD Guidelines, as explained above, but it is also contrary to the logic of the risk-adjustment model and to informal coding guidance.

Risk adjustment reimburses plans for insuring beneficiaries' future health risks based on the medical conditions those beneficiaries had in the prior year. Under that model, the critical question for payment purposes is whether the physician documented that the beneficiary *in fact* had the condition in question. While a condition's impact on care given during a past encounter might be relevant to *provider* compensation, it is irrelevant to the future risk faced by MA plans. What's more, the Complaint focuses on *chronic* conditions—conditions that last more than a year (typically a lifetime), and virtually *always* impact a patient's care, even when another condition is being treated. *See* Participant Training Guide at 6-6; Ex. B (CMS Protocols) at 74. Thus, even though chronic conditions "might not impact every minor healthcare episode," they typically are "documented and reportable" for each encounter because a patient who has had these conditions requires different care than a patient who has not. Participant Training Guide at 6-6. Yet, physicians rarely document, for example, that the reason they chose a particular medication over another for the condition being treated was to avoid confounding a patient's existing chronic condition. Conditioning MA payment on that type of documentation would make no sense.

For these reasons, guidance issued by the AAPC—the organization that certifies risk-adjustment coders and that CMS recommends plans consult for coding (even though its coding guidance is more conservative than CMS's)—rejects the Complaint's central coding premise. The AAPC guidance explains that while traditional guidelines for coding physician claims in FFS

("E/M service") require documentation showing how diagnoses "have been evaluated or addressed . . . to support a level of service. . . . [w]hen coding diagnoses for risk adjustment purposes . . . *[t]here is not a justification* in only reporting those diagnoses that were treated or addressed or explain a level of service." Ex. A at 20. As the AAPC explains, whereas in FFS coding "diagnosis codes are only selected when they are identified as part of the reason for the visit treatment or procedure" and "[d]iagnoses not currently being treated are avoided," this "rule *does not apply to risk adjustment diagnosis coding*, where the goal is to correctly capture all diagnosis codes for all current conditions *without regard to treatment*, as risk adjustment values will largely apply to future needed treatment related to those diagnoses." *Id.* (emphasis added).

CMS itself understands the contrast between diagnosis coding in the FFS and risk-adjustment contexts, and its guidance to its own coders for use in auditing MA plan data goes even further in refuting the central premise of the Complaint:

> Conditions, diagnoses or "problems" can be listed in various sections of a medical record. With an Electronic Medical Record (EMR), conditions from previous encounters are often brought forward/cut and pasted/auto-filled into the current encounter . . . . The question is whether these conditions should be reported for the current encounter if there is not clear evidence (related medications, direct mention by MD in the assessment portion of note) that the patient received "treatment and care."

> Though official coding rules do not change based on the type of audit, the coder should be aware of the background and prospective nature of the RA [risk-adjustment] payment process including its basis on chronic conditions, and dependence on validating chronic conditions for an annual payment on just the review of one record. It is **imperative** therefore to code all chronic conditions documented by an acceptable provider type during a face to face encounter with the patient, **whether or not there was specific treatment mentioned in the one record submitted. Mention or EMR [i.e., automated electronic medical-record] population of the diagnoses narrative list can be interpreted as management and care for the applicable chronic conditions** of the patient once all other coding rules and checks for consistency have been applied. **This is where RADV [risk-adjustment coding] audits may differ in guideline interpretation from fee-for-service**, DRG [diagnosis-related group] audits or others based on just the payment for one specific encounter.

Ex. C (2011 RADV Guide) at 4-5 (emphases added); Ex. D (2012 RADV Guide) at 6 (similar). CMS's RADV Guide makes clear that it is *appropriate* to code chronic conditions (such as the ones at issue here) whether or not the medical record shows that the patient received treatment for that condition during the visit. The mere "mention" of a chronic condition in a medical record, without more, can be interpreted as management and care for the condition. Although these RADV guides are for CMS's internal use and cannot impose obligations on plans, Defendants cannot have committed fraud by coding in the same way that CMS instructs its own coders.

Even worse for the government, CMS's public guidance to PPACA plans about diagnosis coding in the risk-adjustment context interprets the same ICD Guideline on which the Complaint is based—and *rejects* the government's reading of it.[7] *See* Ex. B (CMS Protocols); *supra* at 8 & n.4. The Protocols begin by quoting in full the key ICD Guideline—"code all documented conditions that coexist at the time of the encounter/visit and require or affect patient care treatment or management"—and reaffirming that the ICD Guidelines "must be followed." Ex. B at 73-74. The Protocols then explain how the ICD Guidelines should be interpreted when coding chronic conditions in the risk-adjustment context, explaining that "[t]he chronic conditions must be documented in a way that *it is reasonable to determine* that a physician is managing the patient and treating the chronic condition." *Id.* at 74 (emphasis added). In other words, contrary to the Complaint, CMS does not read the ICD Guidelines as requiring express documentation of how the physician managed the condition; it allows the coder to make a "reasonable determin[ation]."

The Protocols then provide "recommended steps" for coders to determine if the ICD Guidelines standard has been met: (1) determine whether the condition is "chronic"; (2) if so, ask

---

[7] Although the PPACA risk-adjustment model differs slightly from the MA model, there is no reason diagnostic coding principles would apply differently in these two risk-adjustment settings.

whether the condition is "still present"; (3) "[i]f unsure," review whether there is "documentation of current medication treatment or other management of the condition," and like CMS's RADV guides, it instructs that *sufficient documentation* of current treatment or management of the condition "include[s]: a current problem list or past medical history," because "[c]hronic conditions affect the medical decision making of providers when considering treatment options for other presenting problems;" (4) review whether the encounter notes "contradict" the condition; and finally (5) "If the condition is chronic and there is no documentation that contradicts or shows the condition is resolved, then the condition can be abstracted. *A chronic condition is assumed to be present if it is documented in any portion of the medical record*." *Id.* at 74-75 (emphasis added).

CMS's own interpretation of the ICD Guidelines thus refutes the government's theory of liability. While the government's theory requires express documentation of *both* the condition *and* how the condition affected the encounter, CMS's "recommended steps" provide that a chronic condition may be coded and is "assumed to be present if it is documented in *any portion* of the medical record," provided that it is not contradicted by the encounter notes. *Id.* It even expressly cites problem lists and past medical history as permissible examples. Conspicuously absent is any requirement that the physician expressly document that the condition was treated or affected the particular encounter; presence in the problem list or past medical history is sufficient.

Given CMS's own views, and the logic of risk adjustment, it comes as no surprise that a federal court last year squarely rejected this coding theory in dismissing an FCA case. After reviewing CMS's guidance cited by relator, whose brief quoted in bold the same ICD Guideline provision at issue here, the court concluded that "[n]one [of those guidance provisions] require treatment for a condition before it can be coded." *U.S. ex rel. Rasmussen v. Essence Grp. Holdings Corp.*, 2020 WL 4381771, at *7 (W.D. Mo. Apr. 29, 2020); *id.*, Relator's Opp'n to Mot. to

Dismiss, No. 17-cv-03273, ECF No. 88 at 14-15.  The court added that such a coding requirement "appears inconsistent with how [the MA program] works," because "[i]f a patient *has* a medical condition, there is the possibility that treatment will be needed in the ensuing year—even if no treatment was needed in the prior year." *Rasmussen*, 2020 WL 4381771, at *10 n.10 (emphasis added).  For those reasons, "if a medical condition cannot be coded unless it has been treated within the past year, the Court would expect a clearer regulation stating such to be the case."  *Id.*

Heedless of all this, the Complaint builds from its flawed premise to allege that five of Defendants' coding policies were fraudulent: alleged policies on coding from problem lists, past medical history, incidental findings of atherosclerosis, coding of Old MI from EKGs and Chronic Kidney Disease from laboratory results, and Hypoxia.  These allegations fare no better.  They are unsupported by binding authority and contradicted by nonbinding guidance.   They also inaccurately characterize Defendants' actual coding policies.

*i. Problem Lists.*  The government claims that DxID's coding policy, which coded chronic conditions that providers expressly documented in problem lists embedded within medical records, was unlawful and fraudulent.  The Complaint alleges that problem lists are an "impermissible source[]" for deriving diagnoses for risk-adjustment purposes, Compl. ¶ 142, and that CMS "prohibits relying on Problem Lists to code serious or chronic conditions for risk adjustment," *id.* ¶ 150.  The government does not cite a single guidance document addressing problem lists, let alone one setting forth this alleged prohibition.  Instead, this theory appears to be based entirely on the government's claim that the ICD Guidelines require physicians to document not only the existence of a condition, but also how the condition was treated or relevant to care.  *See id.* ¶ 146.

To the extent the government's problem list allegations are based on the theory that the official ICD Guidelines require documentation of *how* the chronic condition affected care, that

claim has been refuted above. To the extent the government claims that coding guidelines more specifically prohibit coding chronic conditions found on problem lists, that claim is simply wrong.

As demonstrated above, CMS's own guidance for coding chronic conditions expressly embraces problem lists as acceptable documentation of a chronic condition. *Supra* at 22-24 (discussing RADV Guides and CMS Protocols). In addition to that general guidance on chronic conditions, CMS provides its coders with specific instructions for problem lists. For problem lists "submitted as a standalone document," CMS did in fact instruct that the problem list must "show evaluation and treatment for the visit." Ex. C (2011 RADV Guide) at 54. But as the government admits, Compl. ¶¶ 292-93, DxID's coding policy permitted coding from problem lists only when they were "embedded" in the "encounter note." *See* Compl., Ex. I at 5. As to "problem lists within an office record," CMS's guidance to its own coders fully vindicates DxID's policy:

> Evaluate the problem list for evidence of whether the conditions are chronic or past and if they are inconsistent with the current encounter documentation (i.e. have they been changed or replaced by a related condition with greater specificity). If after this evaluation and those conditions are signed off by an acceptable provider, *they are reportable and therefore should be coded*, *whether or not specific and related treatment or medications are noted in the current encounter. The presence of a statement "not reviewed" or similar note does not preclude the reporting of the chronic condition*.

Ex. C at 55-56 (emphasis added); *see also* Ex. D (2012 RADV Guide) at 51-52 (similar). CMS's 2017 Protocols likewise provide (Ex. B at 75) that when not contradicted elsewhere in the encounter note, a "chronic condition is assumed to be present if it is documented in any portion of the medical record" and "can be abstracted," expressly singling out problem lists that are part of the medical record for the date of service as a proper source of documentation.

DxID's coding policy relating to use of problem lists virtually mirrors CMS's own guidance. The policy requires that problem lists be "embedded in a face-to-face encounter note that are signed and dated by an acceptable provider at the time of the visit." Compl., Ex. I at 5.

The government oddly attempts to dismiss DxID's distinction between standalone problem lists and "active problem list(s)" that are "within the encounter note"—claiming that such "qualifiers" ordinarily do "not satisfy CMS's documentation requirement." *Id.* ¶¶ 187, 293. But CMS itself makes the same distinction in its (nonbinding) guidance, and the context makes the reasons for the distinction clear: reviewing the entire record permits the coder to determine that the chronic condition has not been replaced by another inconsistent diagnosis, or cured or resolved, after which the coder can presume that the condition continues and affected care.[8]

    *ii. Past Medical History.* The Complaint next alleges that DxID's policy that it would code chronic conditions expressly mentioned in the "past medical history" section of medical charts was fraudulent. *Id.* ¶¶ 297-304. Once again, the Complaint cites no guidance or authority addressing coding conditions documented in a chart's "history" or "past medical history" sections. Instead, the Complaint relies on the same claim, refuted above, that the ICD Guidelines permit coding chronic conditions only if the provider expressly documents treatment or relevance to care.

    Again, the applicable guidance fully supports DxID's coding policy. The AHA Coding Clinic states that when a chronic condition "is listed *only in the history section* with no contradictory information, the condition should be coded. Chronic conditions, such as, but not limited to, hypertension, Parkinson's disease, COPD, and diabetes mellitus are chronic systemic diseases that ordinarily should be coded even in the absence of documented intervention or further evaluation." AHA Coding Clinic, Coding Chronic Conditions (Third Quarter 2007), Ex. F at 13

---

[8] The Complaint claims that DxID's coding policy for problem lists improperly engages in "inferences" and "assumptions," ¶ 293, but those are the same assumptions CMS expressly endorses: that a chronic condition that is not expressly ruled out may be assumed to still exist if it is documented anywhere in the medical record, and that the mention of a chronic condition in a problem list may itself be taken as evidence that the provider treated or managed the condition.

(emphasis added).[9]  The language from DxID's policy that the Complaint challenges as unlawful is *directly quoting* this (nonbinding) guidance.  *Compare* Compl. ¶ 159, *with* Compl., Ex. I at 4 (quoting AHA Coding Clinic).

Although that AHA guidance was addressing in-patient coding, CMS's own guidance reaches the same conclusion even beyond in-patient settings.  CMS's guidance, just like DxID's policy, states that for risk-adjustment purposes it is appropriate to code chronic conditions that appear in the history or past medical history section of a chart, and that mention of the condition in such sections can be taken as evidence of treatment or management.  Ex. D (RADV Guide 2012) at 51 (noting that acceptable lists of diagnoses "may be documented in the patient history"); Ex. B (CMS Protocols) at 74-75 (instructing that if a chronic condition is "documented in any portion of the medical record" including "past medical history," and no documentation "contradicts or shows the condition is resolved," then the condition "can be abstracted" and "is assumed to be present").  CMS's guidance makes clear:  If a condition is *chronic*, it is mentioned in the medical chart, and it is not contradicted, the condition is presumed to have affected care and may be coded.

The Complaint more specifically alleges that Defendants improperly coded "old myocardial infarctions" or "old MIs" based on past medical history.  According to the government, documentation of a past heart attack is insufficient to support an Old MI code; instead, the medical chart must provide documentation that the Old MI was diagnosed again or that it affected the encounter.  That allegation misunderstands both the nature of Old MI and the relevant guidance.  Old MI is treated uniquely in the ICD Guidelines because a myocardial infarction permanently

---

[9]  *See also* AHA *Coding Clinic* at 16-17 (Second Quarter 1992), Ex. E (addressing FFS coding: "If the physician mentions the COPD only in the history section and then again on the attestation with no contradictory information, the condition should be coded.  The same would be true for other chronic conditions such as diabetes mellitus, hypertension, and Parkinson's disease.").

damages the heart muscle, increasing the frequency and severity of health conditions that the beneficiary will experience throughout life. Much like an amputation, the fact that a patient suffered a prior heart attack never changes. While Old MI is akin to a history or status because of its lifelong present impact, the Official ICD Guidelines—which on this point the Complaint ignores—assigns Old MI an active (nonhistory) code, providing that "For old or healed myocardial infarctions not requiring further care, code I25.2, Old myocardial infarction, may be assigned." ICD-10 at 45, 112; ICD-9 at 103 (listing "412, Old myocardial infarction" as a condition exempt from the documentation requirement pertaining to "diagnosis present on admission" because the condition is deemed "always present on admission" if it occurred in the past).[10]

Nonbinding guidance also confirms that Old MI "should be reported to identify a 'healed old MI' whether the patient is currently experiencing problems o[r] not." AHA ICD-9-CM Coding Clinic (Second Quarter 2003) at 10, Ex. O. Likewise, in its guidance for risk-adjustment coders, the AAPC provides an example of a diagnosis list that mentions "Old MI" with *no other information* and instructs that the "old MI may be coded as *factual*." Ex. A at 26 (emphasis added). Old MI may be coded as "factual" because the fact of having had a heart attack never changes and permanently increases health risks. This guidance thus refutes the Complaint's idiosyncratic view (supported by no citation) that Old MI "should not be coded for risk adjustment [purposes] unless it is documented in the medical record as relevant to patient care." Compl. ¶ 157.

***iii. Coding Atherosclerosis from Incidental Findings.*** The Complaint next alleges that DxID "code[d] atherosclerosis from Incidental Findings" in Radiology Reports and "GHC submitted the codes." *Id.* ¶ 223. (The Complaint nowhere alleges that DxID coded this way for

---

[10] The Complaint's reliance (¶ 155) on the ICD-9 Guidelines for when "history (categories V10-V19) may be used as secondary codes" is misplaced. Old MI has *active* codes "412" under ICD-9, and "I25" under ICD-10. It's *not* a V code under ICD-9 or an equivalent Z code under ICD-10.

IH, and this theory thus does not apply to IHA or IHC.)  The Complaint's sole basis for this allegation is an email exchange between DxID's Gaffney and GHC's Rhona Moses.  *Id.* ¶¶ 218-224.  Even a quick review of that exchange shows that this allegation is baseless.  *See* Ex. G.

Moses asks Gaffney whether "[it] [i]s your position that a link within the encounter note to a Rad report that includes an incidental finding of 'atherosclerosis' to be sufficient to code atherosclerosis?"  *Id.*  Gaffney responds "No."  *Id.*  Gaffney then provides arguments why she believes that such coding would be defensible *in theory* and would be upheld in a RADV audit, and the Complaint quotes that language.  *Id.*; Compl. ¶¶ 220-22.  But the Complaint fails to acknowledge that Gaffney twice emphasizes that this view was academic because DxID did *not* code that way:  "I do believe that you can support the code . . . *though we have not applied the rules that way.*"  Ex. G (emphasis added).  After stating her personal view that in certain circumstances you can assume a doctor reviewed a report, she reiterated "*Again—we don't do that.*"  *Id.* (emphasis added).  The email thus completely refutes the Complaint's allegation, and the Complaint pleads no other facts at all to support it.

*iv. EKGs and Laboratory Results.*  The government alleges that Defendants improperly coded Old MI diagnoses codes based on EKG results and CKD diagnoses based on lab results.  Compl. ¶¶ 165, 306-26.  The Complaint again fails to cite any guidance addressing the coding of these conditions, and it mischaracterizes Defendants' coding policies.

With respect to the Old MI/EKG allegations, the government misrepresents DxID's coding policy, which is fully consistent with the both the ICD Guidelines and CMS's informal guidance.  *See id.* ¶¶ 327-30.  The Complaint alleges that DxID did not require "a physician signature," *id.* ¶ 163, and that its coders interpreted EKGs themselves, *id.* ¶ 164 (alleging Defendants submitted "diagnosis codes for Old MI supported only by EKGs"); *id.* ¶ 330 ("DxID coded Old MI solely

from EKGs"). But that was decidedly not DxID's policy, and the notion that DxID had its coders interpreting seismographic lines on EKGs to determine whether they evidenced Old MI is too implausible to survive *Iqbal*, 556 U.S. 662. In fact, the document on which the Complaint relies set forth the "following policy:" "Electrocardiograms *that have been interpreted by a physician,* by initials or electronic signature, and are available to the physician at the time of coding will be coded." *Id.*, Ex. J. Gaffney's email reiterates that the EKG must be "confirmed and dated" by the treating physician, and the email contains examples of physician notations such as "infarct." *See* Jan. 11, 2012 Email with Gaffney and Debbie Sather, Ex. H.

DxID's actual policy was fully in accord with applicable guidance. First, the ICD Guidelines contradict the government's position, providing that it is appropriate to code based on diagnostic tests that have "been interpreted by a physician," even if diagnostic testing was the only service during the encounter. ICD-9 at 95. Second, CMS's internal interpretation of the ICD Guidelines also lists EKGs as an "acceptable example" of documentation sufficient to support a risk-adjustment claim for a heart attack, so long as the EKG has been interpreted by a provider. Ex. C (2011 RADV Guide) at 45. That is true even if the EKG was not accompanied by any "interventional procedures." *Id.* The RADV Guide notes that, generally, a face-to-face visit is required, but explains that this requirement is satisfied in the context of "diagnostic testing," such as EKGs, so long as that testing is accompanied by "acceptable provider interpretation" (i.e., so long as the coder is "abstract[ing the] diagnoses from the physician interpretation, not [from the raw results of the] technical report"). *Id.* at 45, 47-48. Finally, as discussed below, CMS's own guidance states that a physician "initialing and dating" a test is "acceptable" documentation that the physician reviewed and interpreted it. *See infra* at 30.

28

With respect to the Chronic Kidney Disease (CKD) allegations, the government again fails to point to any guidance addressing the criteria for coding CKD. DxID's policy was that CKD could reasonably be coded for beneficiaries who "'Have the lab values that determine CKD (*2 consecutive GFR's [<]60 more than 3 months apart*) – 'available to the physician at the time of a face to face encounter AND have . . . initialed or signed (All are mechanically dated).'" Jan. 16, 2012 Email with Gaffney, Michele Spagna, and Robert Tracy, Ex. I (emphasis added).[11] The Complaint fails to establish that this policy violated applicable rules, much less constituted fraud.

While many conditions cannot be coded from lab results alone, CKD is different because a glomerular filtration rate (GFR) of less than 60 for over 3 months establishes in itself that the patient suffers from CKD. *See What is the Criteria for CKD*, Nat'l Kidney Found., https://www.kidney.org/professionals/explore-your-knowledge/what-is-the-criteria-for-ckd (stating that more than three months of "Decreased GFR," defined as "GFR < 60 ml/min/1.73 m$^2$" meets the criteria for CKD); Margaret Baumgarten & Todd Gehr, *Chronic Kidney Disease: Detection and Evaluation*, 84 Am. Fam. Physician 10 (Nov. 15, 2011), https://www.aafp.org/afp/2011/1115/p1138.html ("The GFR is the best measure of kidney function. . . . A GFR less than 60 mL per minute per 1.73 m$^2$ represents a loss of at least one-half of normal kidney function; below this level, there is an increased prevalence of CKD complications."). The government acknowledges that a CKD diagnosis is based on consecutive

---

[11] The Complaint cites only a portion of this CKD policy from Gaffney's email, *see* Compl. ¶ 308, but the Court may review Gaffney's full email because it may consider any document that the complaint incorporates by reference. *See Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007). Gaffney's email contained various typos, including use of ">" 60 instead of "<" 60.

abnormal GFRs within a short period of time, Compl. ¶ 311 n.23, and it has not (and cannot) allege that patients falling within the DxID policy do not in fact have CKD.[12]

DxID thus did not code CKD "based on mere supposition that an older person is likely to have" CKD, nor did it rely on lab results that were "not necessarily reviewed" by the provider. *Id.* ¶¶ 309, 311 n.23. DxID required lab results that necessarily meet the definition of CKD "AND . . . are initialed or signed," Ex. I, which demonstrates that the physician reviewed and accepted those results. CMS's own guidance confirms that a physician's initials on lab results is acceptable documentation that the physician has reviewed the labs. *See* CMS, 1997 DOCUMENTATION GUIDELINES FOR EVALUATION AND MANAGEMENT SERVICES at 45 (1997) ("[T]he review may be documented by initialing and dating the report containing the test results."). While the government may disagree with DxID's policy, it was reasonable and not fraudulent.

*v. Coding Hypoxia From Orders For Continuous Oxygen.* Finally, the government alleges that DxID "instructed its coders to code hypoxemia based on [durable medical equipment] orders for oxygen," Compl. ¶ 168, which the government alleges is improper because "Oxygen can be used to treat conditions . . . such as obstructive sleep apnea in some limited circumstances," *id.* ¶ 333. Again, the Complaint cites no guidance addressing coding of Hypoxia.

To begin, hypoxia and hypoxemia are assigned code 799.02 under the ICD-9, which is not a *diagnosis* code but rather a *symptom* code, which under the Guidelines may be reported *regardless* of any diagnosed condition. ICD-9 at 93-94 ("Codes that describe symptoms and signs, as opposed to diagnoses, are acceptable for reporting purposes when a . . . diagnosis has not been established (confirmed) by the provider."); ICD-10 at 103 (similar). CMS guidance instructs that

---

[12] CMS's guidance notes that it considers lab results to be inadequate when they are "submitted as standalone medical records[s]." Ex. C at 48. The government does not allege, however, that Defendants submitted standalone lab reports without accompanying medical charts.

"If not documented, the rationale for ordering . . . ancillary services should be easily inferred," CMS, 1997 DOCUMENTATION GUIDELINES FOR EVALUATION AND MANAGEMENT SERVICES at 3 (1997), and the Complaint admits that the easily inferable standard applies here. Compl. ¶ 170 ("oxygen levels low enough to infer Hypoxemia" would justify a hypoxia code).

Hypoxemia is defined as low oxygen, and the Complaint admits that DxID's policy coded Hypoxemia only "when . . . the patient is prescribed continuous oxygen and has a qualifying condition (COPD, Cor Pulmonale, CHF, etc.)." *Id.* ¶ 168 (quoting Compl., Ex. K). It was certainly reasonable, and far from fraudulent, for DxID to conclude that physicians prescribe *continuous* oxygen—i.e., 24/7 oxygen support—to patients who have low oxygen levels and not merely sleep apnea, for which oxygen is used only at night. And requiring documentation of a chronic condition such as COPD or congestive heart failure associated with low oxygen further strengthened the inference. That coding policy was perfectly reasonable, and at worst, a good-faith disagreement that cannot form the basis of an FCA claim. *Purcell*, 807 F.3d at 288.[13]

*    *    *

In sum, even if informal coding guidance could give rise to legal obligations, the Complaint failed to adequately allege that DxID's coding policies were unlawful. Other than the single ICD Guideline, which does not address any of the specific coding rules at issue, the Complaint fails to point to a single guidance document specifically addressing these coding issues, much less setting forth the prohibitions the government claims. CMS's nonbinding guidance not only vindicates

---

[13] The allegations that Defendants submitted codes for Old MI and Hypoxia from "at least DOS year 2010 through at least DOS year 2017," Compl. ¶¶ 330, 338, lacks a reasonable basis. "History of myocardial infarction and hypoxia" were removed from "the 2014 CMS-HCC model," and the last Date of Service year for which such codes were submittable to CMS was 2014. CMS, *Announcement of Calendar Year (CY) 2014 [MA] Capitation Rates and [MA] and Part D Payment Policies and Final Call Letter* at *32* (Apr. 1, 2013), https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/Downloads/Announcement2014.pdf.

DxID's policies, but also confirms that the official ICD Guidelines do not impose the requirements the government claims, since CMS would never instruct coders to violate the ICD Guidelines.

**2.** Defendants' Addenda Process Did Not Violate Any Applicable Guidance

The government's second fraud theory challenges Defendants' addenda process. While the government concedes that it is "legitimate" to query physicians to amend their medical records, Compl. ¶ 342, it alleges that Defendants' process was fraudulent because the addenda were allegedly impermissibly "leading" and "untimely," *id.* ¶¶ 339-412. This fraud theory is even weaker than the government's coding-policy allegations and should be dismissed as well.

DxID sent queries to physicians asking them to certify whether patients had particular conditions. For each condition that DxID ultimately submitted, the physician "affirm[ed]" in writing, signed and dated, that the patient had the condition, that it affected care during the encounter, and that the addendum was being placed in the patient's medical chart. Compl., Ex. M. The addendum thus results in documentation that satisfies even the government's overly-strict reading of the ICD Guidelines: the addendum expressly documents both that the patient has the specific condition and that the condition was treated or affected care during the encounter.[14]

The Complaint nevertheless claims that even though the medical records, as amended by the addenda, clearly provided sufficient documentation of the condition, and even though the physicians presumably were not committing fraud when they affirmed that their patients had the conditions, Defendants' submission of codes based on the addenda was categorically fraudulent, and IH did not deserve to be paid for insuring the conditions the physicians affirmed in fact existed,

---

[14] The Complaint alleges that providers failed to "update the medical records" by going back and revising the preexisting "medical record diagnosis list." Compl. ¶¶ 376-77. That does not mean, however, that the physicians lied about placing the addendum in the medical chart, which suffices to constitute medical record documentation of the condition.

on the ground that the addenda were allegedly unlawfully "leading" and "untimely." To support these claims, the Complaint relies exclusively on informal guidance that does not apply or set forth these rules, even if it were binding. Neither theory states a valid theory of fraud.

*i. Allegation of "Leading" Addenda.* In support of its claim that Defendants' addenda were "impermissibly leading," *id.* ¶¶ 357-79, the government highlights bolded language on the certification form stating that the addendum "serves to further clarify and detail the **diagnosis and conditions that existed at the time of this visit**," *id.* ¶ 367. The government claims that this language, along with the following sentence's language that the condition "coexisted and affected" care, "indicate[s] that DxID was not merely asking but rather asserting as facts that the identified conditions existed." *Id.* ¶ 368. This fraud theory is thoroughly flawed.

To begin, the Complaint cites only two guidance documents that allegedly set forth this "impermissibly leading" prohibition: a "Practice Brief" by AHIMA addressing coding in hospitals, and a CMS manual provision addressing how its affiliated Quality Improvement Organizations (QIOs) should audit hospital claims for payment. *Id.* ¶ 343 n.27. Both of these documents address coding in the FFS context; neither addresses risk-adjustment coding at all. And when applying flexible concepts like whether a communication is impermissibly leading, context matters. In FFS, physicians who are queried may see a direct increase to their reimbursement based on whether they confirm that a condition exists or a procedure was performed. In that context, one might be concerned that physicians' refreshed recollections could be self-serving. But that concern is inapplicable where, as here, physicians' reimbursement is unaffected by whether they confirm the condition. These FFS guidance documents thus cannot establish that Defendants' addenda process in the risk-adjustment context was unlawful or fraudulent.

Even if those guidance documents were directed at risk adjustment, neither sets forth the rule that the government claims. CMS's Quality Improvement Organization Manual neither prohibits "leading" addenda nor explains what would render such queries "leading;" it merely directs QIO reviewers that if a "physician query form is leading in nature or if it introduces new information, the *non-physician* reviewer must refer the case to the *physician* reviewer." *Id.* § 4130 (emphases added). Thus, when a leading query is submitted to a provider in the FFS context, where the provider has some payment incentive, subsequent auditors will elevate it to a physician reviewer to "use his or her professional judgment and discretion in considering the information contained on a hospital's physician query form." *Id.* That is *not* a prohibition on "leading" addenda, especially where the addenda do not affect physician payment. The government's second citation is even less effective: The AHIMA Practice Brief provides the views of a private entity as to "best practices" for *hospitals* in documenting their charts. The views of a private entity cannot establish legal obligations, especially when they are merely best practice suggestions directed at an entirely different type of audience (hospitals) for coding for very different purposes.

In addition to these legal defects, it is only by omitting a critical portion of the addenda that the government can claim that they "assert[ed] as facts" that the conditions existed. The addenda were accompanied by a cover page. The cover page instructed the physician to review the addenda "exercising your own independent medical judgment" to "determine which, *if any*, of the listed diagnoses that you—as the treating physician—recognized, considered, and/or treated." DxID Cover Letter, Ex. J at 1 (emphasis added). The cover characterized the conditions as "suspect"—meaning conditions that *might* exist, not that *do* exist—and explained how the physician should complete the form "[i]f you have reviewed the medical record and determined that the suspect diagnoses are *not* applicable for the patient." *Id.* at 2. Finally, the cover emphasized that the $25

payment was to reimburse the physician for his time "regardless of your specific notations." *Id.* at 1; *see id.* ("This payment is *not* contingent on your signing documentation for any additional or more specific diagnoses . . . ."). The full addendum thus makes clear that the bolded language the government focuses on, Compl. ¶ 367, was not a representation that the patient *has* the conditions. Instead, like in many certification forms, that language merely helps ensure that physicians understand to what they are certifying.

The addendum attached to the Complaint further confirms the non-leading nature of the addenda process. *See id.*, Ex. M. The attached addendum identified three conditions that may have been addressed in the encounter, but the physician confirmed *only one* of them—the third. The physician thus reviewed the first and second suspect conditions, ruled them out, and then confirmed the third condition. That is consistent with the physician exercising independent medical judgment—not being led to take the listed conditions as "statements of fact."[15]

*ii. Addenda Timing.* The Complaint next alleges that Defendants' addenda were "late or untimely." Compl. ¶¶ 380-403. The government is not only unable to identify a binding rule on addenda timing, it is unable to even articulate the timing rule that was allegedly violated. Is the rule that addenda must be submitted within 60 days? 90 days? Six months? The government does not say. Instead, it lists various timelines and alleges that Defendants submitted addenda after the "typical[]" timeframe. *Id.* ¶ 394 (quoting CMS official stating that addenda completed "six months after the fact" might "perhaps" reflect incorrect recollections); *id.* ¶ 380 ("[C]hanges or updates to medical records are typically made within 60 (and typically 30) days of a face-to-face visit."); *id.*

---

[15] The government's implicit allegation that this addendum was representative is, in this respect, accurate. During the investigation, Defendants presented the government with analysis showing that fewer than 9% of the addenda were returned with all of the conditions confirmed.

¶ 393 (alleging that Gaffney and IH employees knew that "addenda over 90 days old were suspect"). Such evanescent deadlines cannot form the basis of a fraud case.

The government cannot settle on a time limit because there is no such limit, as the guidance cited by the government makes clear. The government quotes (¶ 381) AHIMA's *Maintaining a Legally Sound Health Record: Paper and Electronic*, as allegedly "instructing MAOs" with respect to the timeliness of addenda (which AHIMA calls a form of a "late entry."). But AHIMA's instruction to MA plans *destroys* the government's fraud theory. Here is the language, with the portion omitted by the Complaint in italics: "*There is no time limit to writing a late entry; however, the more time that passes, the less reliable the entry becomes.*" Ex. K at 8.[16] The absence of a time limit is precisely why Defendants' conduct could not have been unlawful or fraudulent.

Moreover, the government's proposed timelines all arise from nonbinding guidance addressing FFS reimbursement; not risk-adjustment.[17] The government does not explain why the same standards should apply in both situations, and there is good reason to think they should not. "Timeliness" is inherently contextual. In the FFS context, a physician query asks physicians to recall specific treatments or steps they took during the visit. Addenda in the risk-adjustment context, by contrast, do not require physicians to recall specifics of particular tests or treatments but rather, based on a review of the record, what longstanding chronic conditions their patient has.

---

[16] The Complaint's 2015 date for this document appears to be a typo. It was issued in 2005.

[17] The only risk-adjustment guidance on timeliness cited in the Complaint is CMS's response to "Frequently Asked Questions" for calendar year 2005. Compl. ¶ 343 n.29. That document is not available publicly, either on the HHS online guidance repository or elsewhere on the Internet, and is unavailable to counsel. It apparently was shared only with plans who were audited for 2005, which did not include IH. Meron Affirmation ¶ 18. A document that CMS keeps in the equivalent of a locked drawer and shares only selectively cannot establish a legal obligation. Indeed, HHS has directed that the "Department may not cite, use, or rely on any guidance that is not posted on the guidance repository, except to establish historical facts." *See* HHS Guidance Submissions, HHS, www.hhs.gov/guidance/ (last visited Nov. 12, 2021) (HHS Good Guidance Rule).

It makes sense that the time for adding a diagnosis code for a chronic condition in the MA program would be far longer than the time in traditional Medicare for adding codes tied to specific services.

The CMS conference call that that government cites as establishing a timeliness rule for addenda exemplifies this point.  Compl. ¶¶ 394-95.  The referenced 2011 conference call included several CMS employees discussing addenda related to prior authorizations for power mobility devices in traditional Medicare.  *See* Dec. 5, 2011 CMS Transcript of Special Open Door Forum Conference Call, Ex. L.   A CMS employee stated on the call that physicians could add an addendum to show "that you really did ask the patient to walk [a] certain distance and you forgot to write down how far they could walk," but that it would seem suspicious and would be considered for a fraud investigation if "people [] remember, you know, six months after the fact that they did something during an exam."  *Id.* at 24-25.  A second CMS official then added that "the further that it gets away from the date of service . . . the *less weight* is tend to be given to that" in reviewing the claim for payment.  *Id.* (emphasis added)*.*  Neither official mentioned a categorical rule, and the discussion was very specific to the FFS context where a physician was amending the record to add highly specific details of what transpired during a patient exam.[18]

In short, the Complaint wholly fails to establish that DxID's policy—which requested physicians, within a year of the encounter, based on existing documentation, to confirm whether the patient had a chronic condition—violated any coding rule in the risk-adjustment context.[19]

---

[18]   The government cites CMS's Participant Guide, suggesting that it established a timeline for plans to submit addenda to providers.  Compl. ¶ 343 n.28.  But those citations address wholly unrelated issues.  Participant Guide at 3-19 (noting that providers "must report claims and encounter information in a timely manner" to MA programs or CMS); *id.* at 6-7 (addressing "physicians and hospital outpatient departments" and noting that "[p]ositive test results and notations regarding contact with the patient for a revised plan of treatment often are added to the record several days after the patient encounter").

[19]   In 2019, CMS for the first time stated that it would no longer accept any addenda resulting from queries submitted by MA plans to physicians, regardless of timing.  Because that guidance made

### C.    Defendants' Conduct Was Consistent With An Objectively Reasonable Interpretation of the Applicable Requirements

DxID's coding policies were fully consistent with the ICD Guidelines and nonbinding coding guidance.  But even if Defendants' coding policies were wrong in certain respects, that would not be enough to support a FCA claim because Defendants' interpretation was, at a minimum, objectively reasonable.  *Purcell*, 807 F.3d at 288; *Shimon v. Equifax Info. Servs.*, 994 F.3d 88, 94 (2d Cir. 2021) ("a company does not act in reckless disregard . . . if its reading of the statute . . . was not objectively unreasonable" (citation omitted)); *U.S. ex rel. Donegan v. Anesthesia Assocs. of Kan. City*, 833 F.3d 874, 880 (8th Cir. 2016).  Indeed, the Supreme Court in a related context has made clear that the statutory requirement of a "knowing" or "reckless" mental state—as provided by the FCA—does not impose liability on defendants "who followed an interpretation that could reasonably have found support in the courts, whatever their subjective intent may have been."  *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 70 n.20 (2007).[20]

Courts routinely dismiss FCA cases on this basis, and this Court should do the same.  *See, e.g.*, *Allergan*, 746 F. App'x at 109-10; *U.S. ex rel. Grupp v. DHL Exp. (USA), Inc.*, 47 F. Supp. 3d 171, 177 (W.D.N.Y. 2014) ("[A] defendant's reasonable interpretation of its legal obligation precludes a finding that the defendant had knowledge of its falsity.") (quotation marks and citations

---

clear that codes from such addenda would not survive CMS's audits, IH ended its addenda practice. Compl. ¶ 412.

[20]  *U.S. ex rel. Hixson v. Health Mgmt. Sys.*, 613 F.3d 1186, 1190 (8th Cir. 2010) ("[A] statement that a defendant makes based on a reasonable interpretation of a statute cannot support a claim under the FCA if there is no authoritative contrary interpretation of that statute. That is because the defendant in such a case could not have acted with the knowledge that the FCA requires before liability can attach."); *U.S. ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.*, 214 F.3d 1372, 1378 (D.C. Cir. 2000) ("[I]t is hard to see how [the relators] could . . . have satisfied even the loosest standard of knowledge [under the FCA], i.e., acting 'in reckless disregard of the truth or falsity of the information,' when the relevant legal question was unresolved." (quoting 31 U.S.C. § 3729(b)(3))); *U.S. ex rel. Hagood v. Sonoma Cnty. Water Agency*, 81 F.3d 1465, 1478 (9th Cir. 1996) (A defendant does not act with the requisite deliberate ignorance or reckless disregard by "tak[ing] advantage of a disputed legal question." (citation omitted)).

omitted), *aff'd* 604 F. App'x 40 (2d Cir. 2015); *U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 378 (4th Cir. 2008) ("An FCA relator cannot base a fraud claim on nothing more than his own interpretation of an imprecise [] provision."); *U.S. ex rel. Colucci v. Beth Israel Med. Ctr.*, 785 F. Supp. 2d 303, 316 (S.D.N.Y. 2011) ("Even assuming [their claims] were 'false,' given the lack of clarity in the law, it cannot be said that defendants 'knew' the claims were false."); *id.* at 314 ("The worst that can be said of [defendant] is that it took advantage of the uncertainty in the regulations to maximize its Medicare billings.  This is not fraud.").

### D.  The Complaint Fails Adequately To Plead That IH *Knew* DxID's Coding And Addenda Policies Were Unlawful

Even if DxID's coding and addenda policies violated binding requirements, the Complaint's allegations that IH knew that DxID's policies were unlawful are wholly insufficient under Rule 9(b)'s "stringent pleading requirements."  *Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 188 (2d Cir. 1998).  To satisfy Rule 9(b), it is not enough to provide a "'rough sketch' of fraud," *Johnson*, 686 F. Supp. 2d at 268, nor is it permissible to lump multiple defendants together under a "guilt by association" theory, *U.S. v. Strock*, 2019 WL 4640687, at *5-6 (W.D.N.Y. Sept. 24, 2019).  In particular, a FCA plaintiff must "allege facts that give rise to a strong inference of fraudulent intent."  *Grubea*, 318 F. Supp. 3d at 694 (collecting cases); *U.S. ex rel. Tessler v. City of New York*, 712 F. App'x. 27 (2d Cir. 2017) ("FCA complaints are subject to Federal Rule of Civil Procedure 9(b) . . . . [which] permits scienter to be averred generally, but 'we have repeatedly required plaintiffs to plead the factual basis which gives rise to a strong inference of fraudulent intent.'" (quoting *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991))).

"[M]erely being a parent, or an associated corporation, of a subsidiary that commits an FCA violation is insufficient to support an FCA action."  *U.S. ex rel. Schaengold v. Mem'l Health, Inc.*, 2014 WL 6908856, at *12 (S.D. Ga. Dec. 8, 2014) (citing *U.S. ex rel. Hockett v.*

*Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 59-60 (D.D.C. 2007)).  To survive a motion

to dismiss, therefore, the Complaint must plead facts giving arise to a strong inference that IH,

whose officials are not coders and have no coding expertise, knew or recklessly disregarded that

DxID's coding policies were unlawful.  Yet, the Complaint includes *no* scienter allegations at all

with respect to IH for almost any of the fraud allegations.

There is no allegation that IH knew that DxID's coding practices involving problem lists,

past medical history, Old MI and hypoxia were improper.  Instead, there is simply the conclusory

allegation that "IH knowingly submitted risk-adjusting diagnosis codes for payments that were

invalid, false, or unsupported."  Compl. ¶ 92.  Entire sections of the Complaint are completely

unrelated to IH, focusing on DxID's coding for GHC—a different company that is unassociated

with IH and is no longer involved in this lawsuit—and emails between Gaffney and GHC

employees.  *Id.* ¶¶ 172-280.  The Complaint even alleges at times that IH did *not* know of the

purported problems with DxID's policies.  *See, e.g.*, Compl. ¶ 294 ("Gaffney knew that her

recommendation to IH to code from Problem Lists contradicted the prevailing rules . . . . Gaffney

was telling another MAO . . . something completely different than what she was telling IH.").  The

Complaint's devotion to unrelated parties and suggestion of IH's guilt by association is precisely

the "speculation" that Rule 9(b) was designed to prevent.  *Fogel v. Vega*, 759 F. App'x 18, 25 (2d

Cir. 2018) (quoting *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990)).[21]

The only coding policy that the Complaint attempts to allege that IH knew to be unlawful

is DxID's policies for CKD.  Compl. ¶ 314 ("IH was aware that it was not permitted to code CKD

---

[21]  The government alleges that IH "vouched" for DxID's coding policies, Compl. ¶¶ 263-280, but
that is not a scienter allegation with respect to IH.  Instead, it suggests the opposite—that IH did
*not* think that DxID's coding practices were problematic.  Moreover, the government does not
allege that IH incurs any liability from GHC's purported conduct.  *See id.* ¶¶ 126-280.

from lab results."); *id.* ¶¶ 314-26.   But the allegations support the opposite conclusion.   The government alleges that when Cognisight, an outside coding consultant, recommended that IH delete a subset of diagnosis codes related to CKD, IH did so.   *Id.* ¶ 318.   But that shows only that IH was willing to follow the coding advice of the expert company it hired—deleting codes when that was recommended and vice versa.   Moreover, Cognisight's letter actually informed IH that, because "GFRs are the only way to diagnose CKD," Cognisight "believe[s] that our original position was and remains well reasoned." *Id.* ¶¶ 318-319.   It nonetheless recommended deleting the codes "as a matter of prudence and risk management." *Id.*   That cannot establish that IH knew that Cognisight's policy was unlawful or fraudulent.   Finally, DxID's policy was to code only the GFR results that a physician signed and dated (indicating review and acceptance).   The Complaint does not allege, let alone with particularized facts, that Cognisight's policies with respect to coding of CKD were identical to DxID's, let alone that IH *knew* that they were identical.

The allegations that IH knew or recklessly disregarded that its addenda process was unlawful are also insufficient.   The Complaint's main allegation intending to establish IH's knowledge is its description of a review of certain of IH's codes by HealthRisk Partners (HRP), in which HRP took the position that DxID's addenda would not be accepted by CMS in "an actual RADV audit."   *Id.* ¶ 400.   HRP's prediction of how CMS's coders would review addenda in a RADV audit does not establish that HRP thought that the addenda were legally insufficient under general coding rules.   At most, this shows that IH obtained conflicting advice from coding experts at HRP and at DxID.   The Complaint does not cite any statements or documents showing that IH agreed with HRP and thought that DxID's policies were unlawful.   To the contrary, the Complaint quotes Gaffney explaining that "IH had researched this subject very thoroughly and ultimately IH was comfortable with the information they researched and legal opinions they gathered." *Id.* ¶ 388.

Nor do the various emails the Complaint cites show that IH believed that DxID's addenda process "could be considered fraudulent." *Id.* ¶ 392. In fact they show the opposite: IH's Spagna emailed Faso that she had researched both CMS and NYS requirements, and while she had found some documents (that she attached) stating that "addendums should be 'timely,'" she found "no specific definition" of "timely." May 8, 2012 Email with Gaffney, Spagna, and Faso, Ex. M at 1. Faso responded "I think these help our case." *Id.* Gaffney's emails with IH similarly noted that CMS had not issued any "formal guidance" establishing a 90-day rule, Compl. ¶ 389, and "have not published any guidance in this regard," *id.* ¶ 393. Gaffney further explained to IH that DxID had reviewed all of the relevant guidance, obtained expert legal advice from a former CMS official, and based on that "believe[d] we are applying all of those rules correctly" because "they make no mention of late entries or addendum notes." June 29, 2012 Email with Gaffney and Tracy, Ex. N at 2. And in the email where another IH employee asked about a particular code based on an addendum, Compl. ¶ 401, she characterized it as an "age old question" whether CMS would view the addenda as sufficient. Far from showing actual knowledge or recklessness, these emails show that IH employees asked appropriate questions, diligently researched the requirements, were at worst uncertain, but concluded that the "snippets" they found supported the view that the addenda were appropriate. Researching and asking questions is the antithesis of recklessness.

Spagna's statement that she had found "no specific definition," like Gaffney's statement that CMS had not issued any "formal guidance" establishing a 90-day rule, Compl. ¶ 389, was *correct*. These discussions reflect precisely the conduct one would expect of a compliant company acting in the absence of clear rules or guidance. At the *very* most, the allegations might show that IH was "tak[ing] advantage of a disputed legal question," but that does not suffice to establish the requisite actual knowledge or reckless disregard of falsity. *Hagood*, 81 F.3d at 1478.

### E. The Remaining Counts Are Equally Defective

The FCA conspiracy claim and common-law claims for payment by mistake and unjust enrichment fail for the same and other reasons. *See* Compl. ¶¶ 429-38.

The government alleges that Defendants "conspired" to commit a violation of the FCA's substantive provisions, which is prohibited by 31 U.S.C. § 3729(a)(1)(C). To prove an FCA conspiracy, the government must show: "(1) an unlawful agreement by the defendant to violate the FCA, and (2) at least one overt act performed in furtherance of that agreement." *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 193 (5th Cir. 2009).

*First*, the conspiracy claim against "IHA, IHC, DxID, and Gaffney" fails as a matter of law because, "under the intra-corporate conspiracy doctrine, one entity cannot conspire with its employees" and "it is well established that one corporation and a wholly-owned subsidiary cannot conspire with each other." *Pencheng Si v. Laogai Rsch. Found.*, 71 F. Supp. 3d 73, 98 (D.D.C. 2014) (dismissing FCA conspiracy) (collecting cases).[22] Because of the intra-corporate relationship between IHA, IHC, and DxID, and Gaffney's status as an employee at DxID, Defendants cannot be liable for conspiracy under the FCA.

*Second*, FCA conspirators must have "conspire[d] *to commit a violation*" of the FCA's substantive provisions (as opposed to conspiring to commit acts that happen to violate the FCA). 31 U.S.C. § 3729(a)(1)(C) (emphasis added). Most courts thus hold that FCA conspirators must share "a specific intent to defraud the Government." *U.S. ex rel. Adams v. Remain at Home Senior Care*, 2021 WL 4398584, at *6 (D.S.C. Sept. 27, 2021) (citation omitted); *U.S. ex rel. Haight v. RRSA (Com. Div.)*, 2020 WL 6163139, at *8 (N.D. Tex. Oct. 20, 2020) (citing *U.S. ex rel. Farmer*

---

[22] *See Corsi v. Eagle Publ'g*, 2008 WL 239581, at *3 n.2 (D.D.C. Jan. 30, 2008) (citation omitted).

*v. Houston*, 523 F.3d 333, 343 (5th Cir. 2008)).  The Complaint never alleges that Defendants had specific intent to violate the law, and appears to disclaim that burden.  Compl. ¶ 38.[23]

The claims for unjust enrichment and payment by mistake are equally unavailing and should be dismissed for at least two reasons.  *First*, both common-law claims are unavailable because of the existence of express contracts between the parties.  "As a general rule, the existence of a valid contract precludes a plaintiff from asserting unjust enrichment and payment by mistake claims, which are based on quasi-contract theories."  *U.S. v. Symantec Corp.*, 471 F. Supp. 3d 257, 297-98 (D.D.C. 2020) (citing *U.S. v. First Choice Armor & Equip.*, 808 F. Supp. 2d 68, 77-78 (D.D.C. 2011)).  This is a "foundational principle of contract law," *U.S. v. Kellogg Brown & Root*, 800 F. Supp. 2d 143, 160 (D.D.C. 2011) (citation omitted), and courts in this circuit regularly apply it to dismiss quasi-contract claims, *see, e.g.*, *Lee v. Canada Goose US*, 2021 WL 2665955, at *9 (S.D.N.Y. June 29, 2021) ("[T]he court dismisses Plaintiff's unjust-enrichment claim because such a claim is unavailable when there is an express agreement governing the dispute." (citing *Albrecht v. Comm. on Emp. Benefits of Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 69 (D.C. Cir. 2004))).

Here, there is no question that a contract exists between the parties—the government attached the contracts to its Complaint.  Compl. ¶ 47 n.7 ("Ex. A are the CMS's contracts with Independent Health Benefits Corporations and Ex. B are CMS's contracts with Independent Health Association, Inc.").[24]  Courts in FCA cases regularly dismiss quasi-contract claims on this basis, and this Court should too.  *See U.S. ex rel. Reeves v. Mercer Transp.*, 253 F. Supp. 3d 1242, 1255-

---

[23] Although the FCA's definition of "knowing" and "knowingly" state that those terms do not require "proof of specific intent to defraud," 31 U.S.C. § 3729(b)(1)(B), this definition does not apply to the FCA's conspiracy section, which does not use those defined terms.

[24] Although plaintiffs may generally plead quasi-contract claims in the alternative, "these alternative claims 'must be supported by, at the very least, an allegation that there is no valid contract.'"  *Symantec Corp.*, 471 F. Supp. 3d at 298 (quoting *Kellogg Brown*, 800 F. Supp. 2d at 160).  The government makes no such allegation here.

56 (M.D. Ga. 2017) (dismissing "the Government's claims for unjust enrichment and payment by mistake" in FCA case because of the parties' "underlying contract"); *First Choice Armor & Equip.*, 808 F. Supp. 2d at 77-78 (granting motion to dismiss "the payment by mistake count and the unjust enrichment count" in FCA case because "the government acknowledges that its complaint alleges the existence of an express contract between [defendant] and the United States").[25]

*Second*, both common-law claims are based on the government's flawed FCA allegations and fail for the same reasons. The government alleges that it made payments under the "mistaken understanding" that Defendants' "claims were based on valid risk-adjustment diagnosis," Compl. ¶ 434, and therefore Defendants "were unjustly enriched at the expense of the United States, *id.* ¶ 437. But as discussed above, Defendants submitted *valid* claims that complied with all enforceable obligations under *Allina*; CMS's informal guidance shows that it *shared* Defendants' interpretation of the official ICD Guidelines; and Defendants thus received *appropriate* compensation that reflected the actual risk they assumed. The common-law claims are built on the same flawed foundation as the FCA claims, and they thus fall together. *See, e.g.*, *U.S. v. Aegis Therapies, Inc.*, 2015 WL 1541491, at *14 (S.D. Ga. Mar. 31, 2015) (dismissing the government's "claims for unjust enrichment (Count III) and payment by mistake (Count IV)" because those "claims are purely derivative of the FCA claims," which the court dismissed).

## V.    CONCLUSION

For all these reasons, the Court should dismiss the government's Complaint with prejudice.

---

[25] *See also U.S. v. Sci. Applications Int'l Corp.*, 555 F. Supp. 2d 40, 60 (D.D.C. 2008) (holding in FCA case that "because the express contracts existing between the parties here preclude quasi-contractual claims," [defendant's] motion for summary judgment on the government's quasi-contractual claims [of unjust enrichment and payment by mistake] will be granted").

Dated: November 16, 2021

Respectfully submitted,

*/s/ Daniel Meron*

Daniel Meron (admitted *pro hac vice*)
David C. Tolley (admitted *pro hac vice*)
Michael Clemente (*pro hac vice* pending)
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
daniel.meron@lw.com

Vincent E. Doyle III
Bryan P. Kroetsch
CONNORS LLP
1000 Liberty Building
Buffalo, NY 14202
Tel: (716) 852-5533
Fax: (716) 852-5649

*Attorneys for Defendants*
*Independent Health Corporation;*
*Independent Health Association; and*
*DxID, LLC*

*/s/ Timothy W. Hoover*

Timothy W. Hoover
Spencer L. Durland
HOOVER & DURLAND LLP
561 Franklin Street
Buffalo, New York 14202
Tel: (716) 800-2604
Fax: (716) 885-8569

*Attorneys for Defendant Betsy Gaffney*